# Supreme Court of Florida

_____

No. SC16-1195
_____

**LESHANNON JEROME SHELLY,**
Petitioner,

vs.

**STATE OF FLORIDA,**
Respondent.

December 13, 2018

PER CURIAM.

LeShannon Jerome Shelly seeks review of the decision of the Fourth District Court of Appeal in *Shelly v. State*, 199 So. 3d 973 (Fla. 4th DCA 2016), on the basis that it expressly and directly conflicts with the decision of this Court in *Welch v. State*, 992 So. 2d 206 (Fla. 2008), on a question of law. The decision below references *Moss v. State*, 60 So. 3d 540 (Fla. 4th DCA 2011), instead of *Welch*, even though it states that Shelly reinitiated communication after invoking his right to counsel. We have jurisdiction. *See* art. V, § 3(b)(3), Fla. Const.

## FACTUAL AND PROCEDURAL BACKGROUND

On December 14, 2011, around 11:15 p.m., officers were called to the Orangewood Apartments in Indian River County, Florida, in response to a reported shooting. Upon arrival, officers found two victims, Shanice Smith, who was dead, and Brittany Jackson, who was still alive. The following day, Shelly appeared at the Indian River County Jail at approximately 5:00 a.m. Shelly agreed to answer questions after being taken to the interrogation room and read his *Miranda*[1] rights. The entire interrogation was videotaped and monitored.[2]

Shelly claimed he was in Boynton Beach with two friends during the time of the murder. However, Detective Kevin Heinig informed Shelly that both of his friends claimed that they were not with Shelly past 9:45 p.m.

> [Detective Heinig]: Okay, um--you said you went down to South Florida?
>
> [Shelly]: Yes sir.
>
> [Detective Heinig]: And who was it you went with?
>
> [Shelly]: Loudy and Ayesha Harden.
>
> [Detective Heinig]: Who?
>
> [Shelly]: Loudy Monplasir and Ayesha Harden.

---

1. *Miranda v. Arizona*, 384 U.S. 436 (1966).

2. The entire interrogation lasted approximately four and one-half hours.

[Detective Heinig]:  Okay, I just spoke with both of them.

[Shelly]:  Yes sir.

[Detective Heinig]:  Okay.  Loudy tells me that they picked you up at 9:30.  Oh no, I'm sorry.  Yes, they came to your house around 9:30, 9:40, they picked you up, they took you to This and That and you bought a couple of things, they took you back home 9:45, somewhere in that area and they haven't seen you again for the rest of the night.

[Shelly]:  Man, yea right.

[Detective Heinig]:  They're, they're both telling me that.

Detective Heinig then informed Shelly that he was spotted by two

eyewitnesses leaving the vicinity of the murder shortly after gunshots were heard.

[Detective Heinig]:  Okay.  We also have a eye witness that witnessed the shooting at the park.  They saw the shooter.

[Shelly]:  Yea.

[Detective Heinig]:  Listen.  They saw the shooter shoot three times, turn around, turn back shoot two more times, and then was east through the complex.

. . . .

[Detective Heinig]:  Then I have another witness that sees you, one hundred percent sure you, they've known you for a long time--

[Shelly]:  Yea.

[Detective Heinig]:  --go out of Orangewood Apartments through the back of it, cross across 30th. onto 43rd. Street.

[Shelly]:  Yea.

[Detective Heinig]:  You were talking on your cell phone when you walked by them.

[Shelly]:  I what?  Talking to myself?

[Detective Heinig]:  Talking on your cell phone, had your cell phone up to your ear.

[Shelly]:  How is that possible when I'm on 95--

[Detective Heinig]:  You're not.

[Shelly]:  --at the time?

[Detective Heinig]:  You're not on 95, because they're telling me that you aren't with them.

Shelly then asked Detective Heinig to call his mother so she could confirm that he was dropped off by his two friends at the Fort Pierce Greyhound bus station after coming back from Boynton Beach.  Detective Heinig exited the interrogation room and Detective Chris Cassinari entered.  Detective Cassinari pointed out several issues within Shelly's account of his whereabouts.  Shelly then asked Detective Cassinari to call his mother so she could corroborate his alibi.

[Shelly]:  . . . I wasn't there.  I don't know who was there.  I know I wasn't there.  And I know I was with Ayesha Harden.  Why would I bring they name up out of the blue?

[Detective Cassinari]:  I don't know why you would.

[Shelly]:  I was with--call my mom.  You have a phone right there, all you got to do is call . . . "Mom who dropped me off at the um-- Greyhound Station right beside you in the green Honda?"  That's all I want to know.

Detective Cassinari then exited the interrogation room. While alone in the room, Shelly stated, "Y'all better watch the First 48.[3] I ain't done it. I ain't do it. When the man say he ain't do it let 'em talk to his lawyer, y'all got to let 'em go man. Y'all don't have no evidence on me, dog." Detective Heinig then entered the room and played a portion of a recorded conversation that the detectives had with Shelly's grandmother. Shelly became frustrated that the detectives had spoken with his grandmother instead of his mother. Detective Heinig explained to Shelly that Shelly's mother was also on the phone during the conversation. The following exchange then occurred:

> [Shelly]: --call the 501 number on the top, that's Adam. Man, the man picked me up man. Y'all asked my grandma. I ain't asked you to ask my grandma. My grandma wasn't there man. Y'all tripping dude. Y'all going all out the boundaries bro. Man, let me talk to my lawyer now, dog. Let me talk to my lawyer now man, since y'all want to play crazy. Shit, man, y'all tripping, dog. I ain't doing nothing else without my lawyer, dog. Lock me up, whatever you got to do. I ain't doing no more talking, now y'all tripping, dog. Y'all asking my grandma, a person wasn't even there. My grandma ain't had nothing to do with me picking up. My grandma don't know what's going on man.
>
> [Detective Heinig]: Stand up.

---

3. "The First 48" is a nonfiction investigative television series that "takes viewers behind the scenes of real-life investigations as it follows homicide detectives in the critical first 48 hours of murder investigations, giving viewers unprecedented access to crime scenes, interrogations and forensic processing." A & E Network, *The First 48*, a&etv.com, http://www.aetv.com/shows/the-first-48 (last visited Aug. 20, 2017).

[Shelly]: Yes, I'm gonna stand up.

[Detective Heinig]: Put your hands behind your back.

[Shelly]: Yea. Yea man. Doing no more talking without the lawyer. Y'all are asking my grandma. My grandma at the house man. I say call my mom, not my grandma. Y'all call the last number--

[Detective Heinig]: (Unintelligible) mom talked first--

[Shelly]: --(Unintelligible), man call Adam--

[Detective Heinig]: (Unintelligible.)

[Shelly]: --the number that's on there last. The man that was with my mom in Fort Pierce that picked me up from the Greyhound Station man.

[Detective Heinig]: Who we got to transport? There's no more runaround.

[Shelly]: Ain't no more runaround?

[Detective Heinig]: (Unintelligible). They're gonna have to do the header first.

[Shelly]: Y'all gonna ask my grandma. The shooter had--y'all said the shooter had on pants, I got shorts on and flip flops.

[Detective Heinig]: (Unintelligible) and have a seat.

[Shelly]: Huh?

[Detective Heinig]: Have a seat.

Detective Heinig then stood immediately outside of the interrogation room and had a brief conversation with other detectives concerning Shelly's pending transfer to jail. While Detective Heinig was speaking with the other detectives

Shelly continued to make comments with regard to the phone call with his mother and grandmother.

[Shelly]: (Unintelligible.) Y'all ready?

[Detective Heinig]: No.

[Shelly]: Oh.

[Detective Heinig]: Just relax.

[Shelly]: Alright. I said, call my mom, you called my grandma.

[Detective Heinig]: (Unintelligible.)

[Shelly]: Excuse me sir. My grandma don't have anything to do with--my grandma was home.

[Detective Heinig]: I know they--when they talked to her--

[Shelly]: Man you can't talk to my grandma. My momma is aggravated right now cause she feel like y'all trying to hinder me right now. Talk to my mom, dog. Ta--sir, not dog, but sir.

[Detective Heinig]: Alright.

Detective Heinig then exited the room and Detective Tony Consalo entered. The following exchange then took place.

[Detective Consalo]: We'll be taking you next door in just a few minutes.

[Shelly]: Yes sir, I understand that. Hey sir--excuse me man, sir. All I ask can you do one thing.

[Detective Consalo]: What is that?

[Shelly]: Just call my mom, man. At--listen, sir--

[Detective Consalo]: Shannon--

[Shelly]: --I'm trying to tell you--

[Detective Consalo]: --listen, I just talked to your mom. Your mom called here.

[Shelly]: Yea.

[Detective Consalo]: Okay. I--

[Shelly]: Didn't she pick me up from Fort Pierce, sir?

[Detective Consalo]: Listen to me. Okay, you, you already--you asked for an attorney, okay you didn't want to talk anymore.

[Shelly]: Yea.

[Detective Consalo]: Do you--so I'm not gonna ask you any questions.

[Shelly]: Alright.

[Detective Consalo]: Okay? If you want me to answer that question then you need to tell me that you want to reinitiate conversation with us. Alright, cause I was the one that talked to your mom.

[Shelly]: I know my mom picked me up from Fort Pierce sir.

[Detective Consalo]: Okay.

[Shelly]: We met there dog. Sir. Not dog, but sir. I know we did. I know we did. I know we did. I know we did. We was there man. She was there sitting in a green Honda, right in the um--the Greyhound Station in Fort Pierce, that station, the Greyhound--

[Detective Consalo]: Listen--

[Shelly]: --(Unintelligible).

- 8 -

[Detective Consalo]: You, you know your rights, you know you might not want to say--if you want to talk to us a little bit longer then you need to say I want to talk to you a little bit longer--

[Shelly]: No.

[Detective Consalo]: --and I'll sit there and talk to you. Okay?

[Shelly]: Y'all fixing to book me for nothing. What y'all booking me ah--like for? Okay, no more talk.

[Detective Consalo]: Ah--that's up to you. You said, you, you--

[Shelly]: (Unintelligible.)

[Detective Consalo]: --(Unintelligible).

[Shelly]: No, I'm alright. I'm alright.

[Detective Consalo]: You, you said that you--

[Shelly]: No more talking.

[Detective Consalo]: --wanted your attorney, so no more talking.

[Shelly]: Yea.

[Detective Consalo]: If you want to talk I will be more than happy and I'm gonna shoot straight with you. I've known your family for a long time. I've played softball with your, your, your uncle a many, many times, great--

[Shelly]: Sir, and--

[Detective Consalo]: --softball player.

[Shelly]: --guess what? That's who picked me up man.

[Detective Consalo]: I--I'm--

[Shelly]:  Alright, you want--I'll tal--I'll talk to you.

[Detective Consalo]:  You want to talk?

[Shelly]:  I'll talk to you.  I'll talk to you.

[Detective Consalo]:  And you are reinitiating contact with us, correct--

[Shelly]:  I'll talk to you.

[Detective Consalo]:  --at your request?

[Shelly]:  (Unintelligible.)

[Detective Consalo]:  Okay.

[Shelly]:  I don't want to talk man.

[Detective Consalo]:  Yes, or no?

[Shelly]:  If you gonna lock me up, lock me up.

[Detective Consalo]:  Alright, so--

[Shelly]:  I know I ain't do it.

[Detective Consalo]:  --yes or no?  You tell me if you want to talk.  That's up to you.

[Shelly]:  Cause it ain't getting nowhere I told y'all who picked me up.

[Detective Consalo]:  I, I will tell you what your momma said, and I'll tell you what your grandma said.  Okay?  If you want to talk to me, but I--

[Shelly]:  Well why--I got a question.  I got one more question.  Why is y'all asking my grandma when my grandma don't--

[Detective Consalo]:  We didn't ask your grandma.

[Shelly]:  He did.  He had it on tape recorder.

[Detective Consalo]:  You did--you gonna let me tell you--

[Shelly]:  Okay.

[Detective Consalo]:  That's what I was going to say, but I'm telling you right now you need to say--I--I'm--do you want me to sit here and talk to you for a few minutes?  You asked for an attorney, alright, I'm not gonna ask you any further questions, or talk any further this [sic] about it, unless you want to and you have to say I want to, I want to reinitiate contact with you.  Is that what you want to do?

[Shelly]:  Well I ain't getting nowhere with it.  Y'all--

[Detective Consalo]:  Well, you didn't get anywhere with those guys.  Alright?

[Shelly]:  But I'm trying--all I need man is you to call my mom--

[Detective Consalo]:  I'm telling you I've talked to your mom Shannon.

[Shelly]:  But I--

[Detective Consalo]:  That's what I'm telling you brother.  That's--

[Shelly]:  (Unintelligible.)

[Detective Consalo]:  You tell me, if you want to, if you want me to sit down for a few minutes and talk, I'll just talk.  I won't even ask you qu--

[Shelly]:  I'll talk, come on man.

[Detective Consalo]:  You want to--

[Shelly]:  Reinitiate, come on let's do it.

[Detective Consalo]:  You're reinitiating conversation?

[Shelly]:  I'll talk to you man.

Detective Consalo then communicated to Shelly the conversation that he had

with Shelly's mother earlier in the morning.

[Detective Consalo]:  Your mom--listen to me for a second Shannon, okay.  Your mom called and your mom was hysterical.

[Shelly]:  I know.

[Detective Consalo]:  Okay?

[Shelly]:  Cause about--

[Detective Consalo]:  She said, she said--her--your momma's name is Annie, correct.

[Shelly]:  Yes sir.

[Detective Consalo]:  She said, "This is Annie."  And I said, "Annie this is Tony Consalo."  And we started talking.  I said, "you remember the old fish market down in Gifford?"  I said, "That was my dad's place."

[Shelly]:  (Unintelligible.)

[Detective Consalo]:  I said, "I know Sherman."  I said, "I know some of your family and stuff."  I said, "I know you lost a son years ago to this stuff."  I said, "You don't need to lose somebody else."

[Shelly]:  Right.

[Detective Consalo]: I, I--so what you're doing right now is not helping yourself, because there's a difference between a needle in your arm and maybe a set--a, a--you know a different person.

(Radio transmission in background.)

[Unidentified Deputy]: Hey Tony, come to my officer [sic] before move [sic] him.

[Detective Consalo]: Okay? Um--there's a difference between getting a needle put in your arm for what happened tonight and having a life sentence. Okay? Or maybe even a, a possibility of getting out. And that's remorse. Okay? That's showing that you, you, you have feelings for another human being. I've dated girls and I know how mad they can make you. Okay? And I know I've snapped, not the extent that what happened tonight. But I'm telling you man to man that your momma called, Annie called just a few minutes ago. She called the front office. My secretary told me that, "Annie Shelly is on the phone and she would like to speak to you." I got on that phone, Annie was on the phone. I explained to her what was going on and she broke down. Um--she broke down like my mom broke down when I lost my sister to cancer years ago.

[Shelly]: Yes sir.

[Detective Consalo]: I, I know what it's like to lose a family member. A mom knows what it's like to lose a son. Okay?

[Shelly]: Yes sir.

Shelly continued to allege his alibi; however, Detective Consalo responded that his time frames were off and that there were multiple witnesses that contradicted his alibi.

[Detective Consalo]: Okay, we're done then. Alright? I'm telling your momma--even your momma didn't go with it. Even Annie, before your grandma was on that phone Annie called and she was crying because she's losing another son, that's why. Plain and simple

- 13 -

brother. And I'm telling you that's the difference.

[Shelly]: Sir.

[Detective Consalo]: That's the difference. Shannon, I, I can't do anything for you. Okay? Only you can do something for you and if you're gonna keep denying it, brother we can't--I'm, I'm telling you, I'm telling you--

. . . .

[Detective Consalo]: . . . I'm telling you Brittany is alive. Okay? Brittany is alive and she is gonna pull through and I know you're happy about that. And the reason I say that because I know you didn't want--what happened tonight you didn't want that to happen. I know that. You know that. But unless you tell me that, unless you ah--I can't, I can't--I'm telling you, I'm telling you Shannon it, it--Brittany is gonna make it. Okay? Brittany is gonna make it. She was shot. She was shot in the face. Okay? . . . I'm telling you she's gonna make it and that is something there's no way, there's no way to get past that.

[Shelly]: You're right man.

[Detective Consalo]: Tell me what happened.

Detective Consalo then vocalized that Shelly had reinitiated contact and read him his *Miranda* rights again.

[Detective Consalo]: Alright. Before we go any further--

[Shelly]: Yes sir.

[Detective Consalo]: You re-initiated contact, remember we talked about that. Alright? I want to read you your rights one more time. Okay?

[Shelly]: What happen if I don't re-initiate?

[Detective Consalo]: You--we're done.

- 14 -

[Shelly]:  And I just go to booking?

[Detective Consalo]:  Yea, but we're dealing with what we said. Okay, let me just read you these for a second.  Okay?  Alright, Shannon you have the right to remain silent.  Do you understand that?

[Shelly]:  (No audible response.)

[Detective Consalo]:  Okay.  Anything you say can and will be used against you in a court of law.  Do you understand that?

[Shelly]:  Yes sir.

[Detective Consalo]:  Okay.  You have the right to talk to a lawyer and have him present with you while you're being questioned.  Do you understand that?

[Shelly]:  Yes sir.

[Detective Consalo]:  Okay.  If you cannot afford to hire a lawyer one will be appointed to represent you before any questioning if you wish one.

[Shelly]:  Yes sir.

[Detective Consalo]:  Do you understand that?

[Shelly]:  (No audible response.)

[Detective Consalo]:  Okay.  Alright, do you understand each of the rights that I explained to you?

[Shelly]:  Yes sir.

[Detective Consalo]:  Okay.  With those rights in mind do you want to talk to me?

[Shelly]:  I'll talk to you man.

[Detective Consalo]: I appreciate that.

Shelly then confessed to shooting both victims but claimed the shooting was an accident. Before trial, Shelly moved to suppress his statements, asserting that the detectives had violated his right against self-incrimination and right to counsel. Shelly also asserted that his confession should have been suppressed because his confession was involuntary based on the detectives' discussions with him regarding the death penalty and the impact the death penalty would have on his mother.

*The Motion to Suppress Hearing*

At the suppression hearing, Detective Consalo was questioned by Shelly's counsel regarding Shelly's first mention of an attorney when Shelly was in the interrogation room alone.

> [Detective Consalo]: I wouldn't say that that's a request for an attorney. I think he's just stating, he's talking about The First 48. He's talking about you don't have any evidence. I don't think that's an invocation, that he's requesting an attorney at all and I didn't take it that way.
>
> [Defense Counsel]: Okay. So he's talking about an attorney at that point in time.
>
> [Detective Consalo]: He's talking about a TV show and what happens during a TV show is what he's talking about.

Shelly's counsel then questioned Detective Consalo with regard to Shelly's subsequent *Miranda* right invocations and reinitiation of communication with

detectives. Shelly's counsel contended that despite each invocation of either the right to silence or to an attorney, the detectives continued to interrogate Shelly. Shelly's counsel asserted that Shelly had not reinitiated conversation with officers and any conversation after his assertion of rights should be considered invalid because Shelly was being continuously prompted by detectives to reinitiate conversation when all communication should have immediately ceased when Shelly invoked his rights.

The State responded that after each of Shelly's invocation of rights Shelly continued to ask the detectives questions, thereby reinitiating conversation. The State asserted that Detective Consalo went beyond that which is required by law by reminding Shelly that he had invoked his rights and asked for an attorney. The State averred that Detective Consalo was not required to reread Shelly his *Miranda* rights because Shelly had reinitiated conversation.

The trial court denied both Shelly's initial and renewed motions to suppress his confession. Interrogation transcripts were provided to the jury and Shelly's confession was played during trial. The jury found Shelly guilty of first-degree murder and attempted first-degree murder. Shelly was sentenced to life in prison without the possibility of parole.

Shelly appealed his judgment to the Fourth District on the basis that his confession should have been suppressed because (1) he invoked his right to an attorney and (2) his confession was involuntary based on the detectives' discussions with him regarding the death penalty. *Shelly*, 199 So. 3d at 974. The Fourth District affirmed as to the second argument, without discussion, holding that "the discussion was a proper interrogation tactic, '[m]erely informing a suspect of realistic penalties and encouraging him to tell the truth.' " *Id.* (quoting *Nelson v. State*, 688 So. 2d 971, 974 (Fla. 4th DCA 1997)). As to Shelly's first argument, the Fourth District held that the totality of the circumstances demonstrated the statements made by Shelly were preceded by reinitiated communications of Shelly with the officers. *Id.* The district court found that Shelly was the catalyst for further conversation which led to his confession, and the denial of the motion to suppress the videotape was affirmed. *Id.*

## ANALYSIS

As an initial matter, we hold that *Welch* is the correct standard when evaluating circumstances where an accused has invoked his or her right to counsel or silence and then subsequently has allegedly reinitiated communication with officers. The decision below references *Moss* not *Welch*, even though recognizing that reinitiated communications after the invocation of a right to counsel was at

issue.  We must consider the origins of the two standards and analyze why *Welch* is the correct standard to be applied here.

In *Moss*, the Fourth District stated, "If the accused invoked his right to counsel, courts may admit his responses to further questioning only on finding that he (a) initiated further discussions with the police, and (b) knowingly and intelligently waived the right he had invoked."  60 So. 3d at 544 (quoting *Smith v. Illinois*, 469 U.S. 91, 95 (1984)).  However, in *Welch*, this Court held that "even when an accused has invoked the right to silence or right to counsel, if the accused initiates further conversation, *is reminded of his rights*, and knowingly and voluntarily waives those rights, any incriminating statements made during this conversation may be properly admitted."  992 So. 2d at 214 (emphasis added) (citing *Oregon v. Bradshaw*, 462 U.S. 1039, 1045-46 (1983)).  Although both the *Moss* and *Welch* standards appear to be nearly identical, there exists one crucial difference.  Both involve a suspect that has (1) invoked his or her right to counsel or right to silence; (2) engaged in further conversation with police; and (3) waived his or her previously invoked rights.  Importantly, however, missing from the *Moss* standard is the requirement in *Welch* that the accused be *reminded of his or her rights*.  *Compare Moss*, 60 So. 3d at 544, *with Welch*, 992 So. 2d at 214.  Thus, there is some discrepancy between these elements as to the correct legal standard.

We must understand the origin of the two standards and how each standard has been used in Florida.

The standard in *Welch* is derived from *Bradshaw*. *See Welch*, 992 So. 2d at 214. Although the standard is not explicitly stated in *Bradshaw*, the facts of the case outline that which would become the standard articulated by this Court in *Welch*. Bradshaw was questioned during an investigation of the death of a person whose body had been found in Bradshaw's pickup truck. *Bradshaw*, 462 U.S. at 1041. Bradshaw was advised of his *Miranda* rights and admitted to providing the victim with liquor for a party but denied involvement in the traffic accident that killed the victim. *Id.* Bradshaw was then arrested for providing liquor to the victim, a minor, and was again advised of his *Miranda* rights. *Id.* An officer then stated to Bradshaw his theory which placed Bradshaw behind the wheel of the vehicle. *Id.* Bradshaw again denied his involvement and then stated, "I do want an attorney before it goes very much further." *Id.* at 1041-42. The officer then immediately terminated the interrogation. *Id.* at 1042. Sometime later, Bradshaw inquired to a police officer, "Well, what is going to happen to me now?" *Id.* The officer responded, "You do not have to talk to me. You have requested an attorney . . . ." *Id.* A conversation followed in which Bradshaw agreed to take a polygraph examination, stating he was willing to do whatever he could to clear up the matter. *Id.* Bradshaw was again reminded of his *Miranda* rights and ultimately recanted

his earlier story, admitting he was the driver of the vehicle in which the victim was killed. *Id.* The Oregon Court of Appeals held that Bradshaw's inquiry of what would happen to him did not "initiate" a conversation with the officer, and that therefore his eventual incriminating statements should have been excluded under *Edwards*.[4] *Bradshaw*, 462 U.S. at 1042. The United States Supreme Court reversed, holding that *Edwards* did not stand for the proposition that the initiation of a conversation by an accused after having invoked the right to counsel amounts to a waiver of the right to counsel. *Id.* at 1044. Rather, a two-step process is involved—after finding no *Edwards* violation, the inquiry is whether, under the totality of circumstances, the accused made a knowing and intelligent waiver of the right to counsel. *Id.* at 1045-46. The Court further held that, in asking "Well, what is going to happen to me now?," Bradshaw had "initiated" further conversation for purpose of the *Edwards* rule.[5] *Bradshaw*, 462 U.S. at 1045-46.

Likewise, in *Welch*, this Court held that Welch's statements were admissible because they were made pursuant to a voluntary, knowing, and intelligent waiver.

---

4. *Edwards v. Arizona*, 451 U.S. 477 (1981).

5. "[A]n accused . . . having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Edwards*, 451 U.S. at 484-85.

992 So. 2d at 214. Welch was advised of his *Miranda* rights during an interrogation concerning a double homicide. *Id.* After some interrogation Welch invoked his right to silence and the interrogation stopped. *Id.* Welch was left alone for forty-five minutes before asking a detective, "What is going to happen to me now?" *Id.* Welch was *readvised* of his *Miranda* rights before detectives began interrogating him again, which led to Welch ultimately making a confession. *Id.* at 215. This Court held that "even when an accused has invoked the right to silence or right to counsel, if the accused initiates further conversation, *is reminded of his rights*, and knowingly and voluntarily waives those rights, any incriminating statements made during this conversation may be properly admitted." *Id.* at 214 (emphasis added) (citing *Bradshaw*, 462 U.S. at 1045-46). Thus this Court held that Welch's statements were admissible. *Id.* at 215.

This Court formulated the *Welch* standard in 2008. *See id.* However, in 2011, the Fourth District applied a different standard in *Moss*. *See Moss*, 60 So. 3d at 544. In *Moss*, the Fourth District held that the trial court erred in denying Moss's motion to suppress. *See id.* While being advised of his *Miranda* rights Moss stated, "I want to talk to a lawyer." *Id.* at 542. The Fourth District reversed the trial court's determination that Moss's invocation was equivocal. *Id.* at 543. The Fourth District then addressed waiver and stated, "[I]f the accused invoked his right to counsel, courts may admit his responses to further questioning only on

finding that he (a) initiated further discussions with the police, and (b) knowingly and intelligently waived the right he had invoked." *Id.* (quoting *Smith*, 469 U.S. at 95). The district court held that the detective interrogating Moss coerced him into confessing by continuing to question Moss after Moss's invocation. *Id.* "[T]he detective disregarded Moss's invocation of his right to counsel and continued to question Moss in the first breath after the invocation. . . . After his request for a lawyer, Moss did not reinitiate further exchanges with law enforcement; the ongoing interrogation never paused." *Id.*

The standard in *Moss* is extracted from *Smith*, 469 U.S. 91. *See Moss*, 60 So. 3d at 543. In *Smith*, the Supreme Court reversed the Illinois Supreme Court's holding that Smith had not effectively invoked his right to counsel. 469 U.S. at 99. When Smith was informed that he had the right to counsel being present during questioning, he responded, "Uh, yeah. I'd like to do that." *Id.* at 93. Questioning did not cease and Smith eventually made incriminating statements. *Id.* at 93-94. The Appellate Court of Illinois and the Illinois Supreme Court held that Smith did not clearly assert his right to counsel because he had responded to further questioning. *Id.* at 94. The Supreme Court disagreed and stated that if an "accused invoked his right to counsel, courts may admit his responses to further questioning only on finding that he (a) initiated further discussions with the police, and (b) knowingly and intelligently waived the right he had invoked." *Id.* at 95 (citing

*Edwards*, 451 U.S. at 485, 486 n.9).  "[A]n accused's *postrequest* responses to further interrogation may not be used to cast retrospective doubt on the clarity of the initial request itself."  *Id.* at 100.

Factually, both *Moss* and *Smith* involve instances where detectives did not cease questioning once the defendant had invoked his right to counsel.  *See Moss*, 60 So. 3d at 544; *Smith*, 469 U.S. at 99.  On the other hand, both *Welch* and *Bradshaw* involve instances where the accused invoked the right to silence or counsel, the interrogation ceased, and the accused allegedly reinitiated communication with officers.  *See Welch*, 992 So. 2d 206; *Bradshaw*, 462 U.S. 1039.  However, if an accused invokes his or her *Miranda* rights but later reinitiates communication, *an accused must be reminded of his or her Miranda rights* pursuant to this Court's holding in *Welch*.  *See Welch*, 992 So. 2d at 214.  Thus there is conflict between the two standards.

Subsequent to this Court's decision in *Welch*, the standard formulated by the Supreme Court in *Smith* has been used a total of five times within Florida.  *See Simon v. State*, 216 So. 3d 720, 722 (Fla. 4th DCA 2017); *Davis v. State*, 153 So. 3d 360, 365 (Fla. 4th DCA 2014); *Calder v. State*, 133 So. 3d 1025, 1030 (Fla. 4th DCA 2014); *Black v. State*, 59 So. 3d 340, 346 (Fla. 4th DCA 2011); *Moss*, 60 So. 3d at 544.  *Welch* expands the requirements of the standard in *Smith* by specifically including a requirement that the accused be specifically given his or her *Miranda*

rights *after an alleged reinitiation*. We conclude that it is incorrect for the standard in *Moss* to be utilized. Accordingly, we conclude that *Welch* is the correct standard when an accused has invoked his or her right to counsel or silence, and then is alleged to have subsequently reinitiated communication with officers.

*Shelly's First Mention of a Lawyer*

With regard to this case, Shelly's first mention of a lawyer, while seated alone in the interrogation room, was equivocal.

> [A]ppellate courts should . . . accord a presumption of correctness to the trial court's rulings on motions to suppress with regard to the trial court's determination of historical facts, but appellate courts must independently review mixed questions of law and fact that ultimately determine constitutional issues arising in the context of the Fourth and Fifth Amendment and, by extension, article I, section 9 of the Florida Constitution.

*Miller v. State*, 42 So. 3d 204, 220 (Fla. 2010) (alteration in original) (quoting *Connor v. State*, 803 So. 2d 598, 608 (Fla. 2001)).

> In *Miranda*, the United States Supreme Court determined that the Fifth and Fourteenth Amendments' prohibition against self-incrimination requires advising a prospective defendant that he has the right to remain silent and also the right to the presence of counsel. 384 U.S. 479; *Edwards v. Arizona*, 451 U.S. 477, 481-82 (1981). After being advised of his rights, if an accused indicates that he wishes to remain silent, "the interrogation must cease." *Miranda*, 384 U.S. at 474; *see also Edwards*, 451 U.S. at 482.

*Welch*, 992 So. 2d at 214. "After a suspect invokes his or her *Miranda* rights, police officers are prohibited from engaging in words or actions that the officers 'should know are reasonably likely to elicit an incriminating response from the

suspect.' " *Cuervo v. State*, 967 So. 2d 155, 164 (Fla. 2007) (quoting *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980)). The prohibition of further questioning applies not only when the suspect requests counsel, but also when the suspect exercises his or her right to remain silent. *See Traylor v. State*, 596 So. 2d 957, 966 (Fla. 1992).

The Supreme Court has held:

> Invocation of the *Miranda* right to counsel "requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney." But if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, our precedents do not require the cessation of questioning.

*Davis v. United States*, 512 U.S. 452, 459 (1994) (citation omitted) (quoting *McNeil v. Wisconsin*, 501 U.S. 171, 178 (1991)).

Shelly contends that his statement, "Y'all better watch the First 48. I ain't done it. I ain't do it. When the man say he ain't do it let 'em talk to his lawyer, y'all got to let 'em go man"—made while seated alone in the interrogation room— was unequivocal. Detective Consalo and counsel for Shelly had the following exchange at the motion to suppress hearing:

> [Defense Counsel]: So he asked for an attorney and you were monitoring that and you knew that?
>
> [Detective Consalo]: I wouldn't say that that's a request for an attorney. I think he's just stating, he's talking about The First 48. He's talking about you don't have any evidence. I don't think that's an invocation, that he's requesting an attorney at all and I didn't take it that way.

- 26 -

[Defense Counsel]: Okay. So he's talking about an attorney at that point in time.

[Detective Consalo]: He's talking about a TV show and what happens during a TV show is what he's talking about.

In our view, Shelly's first mention of a lawyer in this passage was not unambiguous. A reasonable police officer under the circumstances would not reasonably understand that Shelly was invoking his *Miranda* rights because Shelly simply mentioned the word "lawyer" within the broader context of discussing a television program. Shelly's statement, "When the man say he ain't do it let 'em talk to his lawyer, y'all got to let 'em go man," is not sufficiently clear to reasonably conclude that Shelly was invoking his *Miranda* rights with these words. Moreover, even though Detective Consalo was monitoring the interrogation room via video feed when Shelly made this statement, the statement was made while Shelly was in the interrogation room alone. As a result, Detective Consalo did not reasonably understand Shelly's utterance to be an invocation of his right to counsel. Accordingly, we conclude that Shelly's initial reference to a lawyer was equivocal and the detectives were not required to cease questioning.

*Shelly's Unequivocal Invocation*

Shelly contends that it was the detectives, not he, who reinitiated communication after he invoked his *Miranda* rights. Review of the interrogation, however, reveals that Shelly continued to make comments and ask the detectives

questions directly related to the investigation after he invoked his *Miranda* rights.

*See supra* pp. 6-7. Shelly had the following exchange with Detective Consalo after

being placed in handcuffs.

> [Detective Consalo]: We'll be taking you next door in just a few
> minutes.
>
> [Shelly]: Yes sir, I understand that. Hey sir--excuse me man, sir. All
> I ask can you do one thing.
>
> [Detective Consalo]: What is that?
>
> [Shelly]: Just call my mom, man. At--listen, sir--

In *Bradshaw*, the Supreme Court held that a suspect's inquiries that related

generally to the investigation evinced the suspect's willingness and desire for a

discussion about the investigation. 462 U.S. at 1045-46. We conclude that Shelly

reinitiated communication with Detective Consalo by asking him to call his

mother, who Shelly asserted was an alibi witness.

Importantly, however, Shelly later unequivocally invoked his right to

silence.

> [Detective Consalo]: You, you know your rights, you know you
> might not want to say--if you want to talk to us a little bit longer then
> you need to say I want to talk to you a little bit longer--
>
> [Shelly]: No.
>
> [Detective Consalo]: --and I'll sit there and talk to you. Okay?
>
> [Shelly]: Y'all fixing to book me for nothing. What y'all booking me
> ah--like for? *Okay, no more talk*.

[Detective Consalo]:  Ah--that's up to you.  You said, you, you--

[Shelly]:  (Unintelligible.)

[Detective Consalo]:  --(Unintelligible).

[Shelly]:  *No, I'm alright.  I'm alright.*

[Detective Consalo]:  You, you said that you--

[Shelly]:  *No more talking.*

[Detective Consalo]:  --wanted your attorney, so no more talking.

[Shelly]:  *Yea.*

[Detective Consalo]:  If you want to talk I will be more than happy and I'm gonna shoot straight with you.  I've known your family for a long time.  I've played softball with your, your, your uncle a many, many times, great--

[Shelly]:  Sir, and--

[Detective Consalo]:  --softball player.

[Shelly]:  --guess what?  That's who picked me up man.

[Detective Consalo]:  I--I'm--

[Shelly]:  Alright, you want--I'll tal--I'll talk to you.

[Detective Consalo]:  You want to talk?

[Shelly]:  I'll talk to you.  I'll talk to you.

[Detective Consalo]:  And you are reinitiating contact with us, correct--

[Shelly]:  I'll talk to you.

[Detective Consalo]:  --at your request?

[Shelly]:  (Unintelligible.)

[Detective Consalo]:  Okay.

[Shelly]:  *I don't want to talk man.*

[Detective Consalo]:  Yes, or no?

[Shelly]:  If you gonna lock me up, lock me up.

[Detective Consalo]:  Alright, so--

[Shelly]:  I know I ain't do it.

[Detective Consalo]:  --yes or no?  You tell me if you want to talk. That's up to you.

[Shelly]:  Cause it ain't getting nowhere I told y'all who picked me up.

[Detective Consalo]:  I, I will tell you what your momma said, and I'll tell you what your grandma said.  Okay?  If you want to talk to me, but I--

From this exchange we can see that Detective Consalo wholly ignored Shelly's invocations of his rights and immediately proceeded to attempt to coax him into continuing with the interrogation.  Detective Consalo failed to cease interrogating Shelly after Shelly unequivocally invoked his right to silence.  *See Welch*, 992 So. 2d at 214 ("[I]f an accused indicates that he wishes to remain silent, 'the

interrogation must cease.' " (quoting *Miranda*, 384 U.S. at 474)); *see also*

*Edwards*, 451 U.S. at 482.

We hold that Detective Consalo's subsequent statements—with regard to (1)

knowing Shelly's family; (2) promising to tell Shelly what Shelly's mother said;

(3) telling Shelly that Shelly's mother is losing another son; and (4) telling Shelly

two times that there is a difference between "getting a needle put in your arm" and

a life sentence—amounted to interrogation. *See supra* p. 9-14; *see also Innis*, 446

U.S. at 301 ("[T]he term 'interrogation' under *Miranda* refers not only to express

questioning, but also to any words or actions on the part of the police . . . that the

police should know are reasonably likely to elicit an incriminating response from

the suspect."); *Cuervo*, 967 So. 2d at 164 (statements by officers to the defendant

that he still had an opportunity to tell "his side of the story" amounted to

interrogation because the officers could reasonably anticipate they would elicit an

incriminating response); *Calder*, 133 So. 3d at 1030 ("After Calder made his

unequivocal request for counsel, the detective did not cease questioning him.

Instead, he continued talking to Calder in an effort to coax him into speaking

without counsel. . . . These statements constituted interrogation . . . ."); *Gilbert v.*

*State*, 104 So. 3d 1123, 1125 (Fla. 4th DCA 2012) ("Almost immediately after [the

defendant] invoked his right to counsel, the detectives engaged in interrogation by

telling the defendant that they were trying to 'protect' him and encouraging him to

tell his 'side of the story.' "); *Black*, 59 So. 3d at 346 (detective was in violation of *Miranda* by continuing to ask defendant whether he wanted to talk to him about the crimes after the defendant had clearly invoked his right to counsel). Detective Consalo's actions can be likened to the proverbial carrot-and-stick—using reward and punishment to induce Shelly to acquiesce to continued interrogation. There can be no doubt these statements induced Shelly to continue engaging with Detective Consalo, even though he had clearly previously invoked his right to silence numerous times.

When, as in this case, a detective persists in attempting to coax a suspect to continue the interrogation after the suspect has unequivocally invoked his right to silence, the detective is not asking harmless clarifying questions; he is violating the suspect's *Miranda* rights. *See Cuervo*, 967 So. 2d at 165.

> [A]ny statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked.

*Miranda*, 384 U.S. at 474. Any statements that are produced as a result of a *Miranda* violation must be suppressed. *Id.* at 479 ("[U]nless and until such warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against him.").

Having concluded that Shelly's *Miranda* rights were violated, we cannot hold that his subsequent waiver was voluntary.

> As this Court and the United States Supreme Court have made clear, "the ultimate issue of voluntariness is a legal rather than factual question." *Ramirez* [*v. State*], 739 So. 2d [568,] 575 [(Fla. 1999)] (citing *Miller v. Fenton*, 474 U.S. 104, 109 (1985)). The State bears the burden of showing that "the confession was not compelled, but was voluntarily made." *Id.* at 573. Further, where a confession is obtained after the administration of *Miranda* warnings, "the State bears a 'heavy burden' to demonstrate that the defendant knowingly and intelligently waived his or her privilege against self-incrimination and the right to counsel." *Id.* at 575.

*Ross v. State*, 45 So. 3d 403, 418 (Fla. 2010) (citations omitted). Shelly did not voluntarily initiate further conversation with Detective Consalo because the interrogation never stopped once Shelly invoked his right to silence. Any statement taken after the invocation of a suspect's Fifth Amendment privilege cannot be other than the product of compulsion, subtle or otherwise. *Edward*s, 451 U.S. 477; *Miranda*, 384 U.S. at 479; *see also Minnick v. Mississippi*, 498 U.S. 146 (1990). Thus Shelly's subsequent waiver was the product of Detective Consalo's coercively persistent and repeated efforts to wear down Shelly's resistance and induce Shelly to continue the interrogation and eventually confess. We conclude then that the State is unable to meet its heavy burden of demonstrating that Shelly's subsequent *Miranda* waiver was voluntarily made.

The admissibility of any statements obtained after the accused has invoked his right to counsel and decided to remain silent "depends under *Miranda* on

whether his 'right to cut off questioning' was 'scrupulously honored.' " *Michigan*

*v. Mosley*, 423 U.S. 96, 104 (1975) (quoting *Miranda*, 384 U.S. at 474, 479); *see*

*also Cuervo*, 967 So. 2d at 161.  Accordingly, we conclude that the trial court erred

in admitting Shelly's confession.

*Harmless Error Analysis*

> *Miranda* violations are subject to a harmless error analysis.  *See Caso v. State*, 524 So. 2d 422, 425 (Fla. 1988).  To affirm a conviction despite error at trial, the State must prove beyond a reasonable doubt that the error "did not contribute to the verdict or, alternatively stated, that there is no reasonable possibility that the error contributed to the conviction."  *State v. DiGuilio*, 491 So. 2d 1129, 1135 (Fla. 1986).  Under *DiGuilio*, the focus of this Court is on the overall effect of the error on the trier of fact; not to substitute itself for the trier of fact and reweigh the evidence.  *See id.* at 1139.  Further, if a defendant's statement resulted from a law enforcement officer's illegal actions, that evidence is "fruit of the poisonous tree" and the trial court should exclude it from trial.  *See State v. Frierson*, 926 So. 2d 1139, 1143 (Fla. 2006) (quoting *Wong Sun v. U.S.*, 371 U.S. 471, 488 (1963)).

*Deviney v. State*, 112 So. 3d 57, 79 (Fla. 2013).  Further, as explained by this Court

in *Diguilio*:

> [H]armless error analysis must not become a device whereby the appellate court substitutes itself for the jury, examines the permissible evidence, excludes the impermissible evidence, and determines that the evidence of guilt is sufficient or even overwhelming based on the permissible evidence. . . .

>> Overwhelming evidence of guilt does not negate the fact that an error that constituted a substantial part of the prosecution's case may have played a substantial part in the jury's deliberation and thus contributed to the actual verdict reached, for the jury may have reached its verdict because of the error without considering other reasons

> untainted by error that would have supported the same result.
>
> . . . .
>
> . . . The test is not a sufficiency-of-the-evidence, a correct result, a not clearly wrong, a substantial evidence, a more probable than not, a clear and convincing, or even an overwhelming evidence test. Harmless error is not a device for the appellate court to substitute itself for the trier-of-fact by simply weighing the evidence. The focus is on the effect of the error on the trier-of-fact. The question is whether there is a reasonable possibility that the error affected the verdict. The burden to show the error was harmless must remain on the state. If the appellate court cannot say beyond a reasonable doubt that the error did not affect the verdict, then the error is by definition harmful.

*Diguilio*, 491 So. 2d at 1136-39 (citation omitted) (quoting *People v. Ross*, 429 P.2d 606, 621 (Cal. 1967) (Traynor, C.J., dissenting), *rev'd sub nom. Ross v. California*, 391 U.S. 470 (1968)).

Under the standard articulated by this Court in *DiGuilio*, we conclude that the admission of Shelly's taped confession cannot be deemed harmless error. Shelly's interrogation and transcripts of the recorded interrogation were provided to the jury. It is difficult to dispute that such a confession most likely played a role in Shelly's conviction. Additionally, the prosecutor used Shelly's interrogation statements to have Shelly mark down how many lies he told the detectives before confessing to the shootings. The prosecutor also pointed out that Shelly's confession was contrary to his testimony at trial. Further, in his closing argument, the prosecutor repeatedly mentioned Shelly's confession during the interrogation

and played several clips of the taped confession. Therefore, we conclude that it is impossible to say that Shelly's confession did not contribute to the verdict. Thus the admission of Shelly's taped confession cannot be deemed harmless error.

## CONCLUSION

For the reasons discussed, we quash the Fourth District Court of Appeal's decision. We remand this case to the district court with instructions that the case be further remanded for a new trial to be conducted without introducing the portions of statements made on December 15 after Shelly unequivocally invoked his right to silence.

It is so ordered.

PARIENTE, LEWIS, QUINCE, and LABARGA, JJ., concur.
LAWSON, J., dissents with an opinion, in which CANADY, C.J., and POLSTON, J., concur.

ANY MOTION FOR REHEARING OR CLARIFICATION MUST BE FILED WITHIN SEVEN DAYS. A RESPONSE TO THE MOTION FOR REHEARING/CLARIFICATION MAY BE FILED WITHIN FIVE DAYS AFTER THE FILING OF THE MOTION FOR REHEARING/CLARIFICATION. NOT FINAL UNTIL THIS TIME PERIOD EXPIRES TO FILE A REHEARING/CLARIFICATION MOTION AND, IF FILED, DETERMINED.

LAWSON, J., dissenting.

The majority concludes that a citation in the Fourth District's three-paragraph decision in *Shelly v. State*, 199 So. 3d 973 (Fla. 4th DCA 2016), expressly and directly conflicts with a sentence in *Welch v. State*, 992 So. 2d 206

(Fla. 2008). It does not. Because we have no authority to decide this case, I dissent.

The Florida Constitution grants this Court authority to "review any decision of a district court of appeal . . . that expressly and directly conflicts with a decision of another district court of appeal or of the supreme court on the same question of law." Art. V, § 3(b)(3), Fla. Const. This constitutional provision is the only one alleged as granting us power to decide this case. For this Court to lawfully entertain jurisdiction under this provision, the "[c]onflict between decisions must be express and direct, i.e., *it must appear within the four corners of the majority decision*" of the district court. *Reaves v. State*, 485 So. 2d 829, 830 (Fla. 1986) (emphasis added). The jurisdictional rationale suggested by the majority fails this well-settled requirement.

According to the majority, a direct conflict is apparent from the following citation in the third paragraph of *Shelly*:

> "When an accused has 'expressed his desire to deal with the police only through counsel, [he] is not subject to further interrogation by the authorities until counsel has been made available to him, *unless* the accused himself initiates further communication, exchanges, or conversations with the police.' " *Moss v. State*, 60 So. 3d 540, 542-43 (Fla. 4th DCA 2011) (alteration in original) (emphasis added) (quoting *Edwards v. Arizona*, 451 U.S. 477, 484-85, 101 S. Ct. 1880, 68 L. Ed. 2d 378 (1981)).

*Shelly*, 199 So. 3d at 974. *See* majority op. at 1, 18-25. As discussed further below, the premise that this citation gives rise to express-and-direct conflict

- 37 -

jurisdiction is unsound for several reasons: first, the citation is to binding, valid precedent; second, the majority's explanation for the conflict with that precedent depends on facts not stated in the district court's opinion; third, the purported conflict, if it exists at all, is actually between *Moss* and *Welch*, rather than *Shelly* and *Welch*; fourth, *Welch* did not even reach the holding upon which the finding of conflict is based; and, fifth, the purported *Welch* holding pertains to a matter that was not raised to the Fourth District in Shelly's case.

As to the first observation, the majority holds that a pin citation to an accurate quotation from a binding United States Supreme Court decision creates a conflict between *Shelly* and one of this Court's decisions. This proposition cannot be valid—unless the allegedly conflicting decision of this Court is erroneous, which the majority has not suggested to be the case. Because all Florida courts are bound by *Edwards*, the seminal United States Supreme Court case on the Fifth Amendment question decided in *Shelly*, the language identified by the majority as the sole basis for conflict—a pin citation to an accurate quotation of the *Edwards* holding—cannot support a finding of express and direct conflict between the district court's decision and one of this Court's decisions. *See Miami Home Milk Producers Ass'n v. Milk Control Bd*., 169 So. 541, 544 (Fla. 1936) (explaining that "we are of course bound by the decisions of" the United States Supreme Court "construing the meaning and effect of" provisions of the United States

- 38 -

Constitution). The majority's reliance on the *Moss* citation as its basis for finding jurisdiction is also analytically indistinguishable from reliance on a citation in a district court decision that merely affirms with citation—which is clearly unauthorized. *Gandy v. State*, 846 So. 2d 1141, 1143 (Fla. 2003) ("This Court does not have jurisdiction to review per curiam decisions of the district courts of appeal that merely affirm with citations to cases not pending review in this Court." (quoting *Persaud v. State*, 838 So. 2d 529, 532 (Fla. 2003)).

Despite these oversights, given the majority's lengthy recitation of facts and legal analysis of the "*Edwards* rule" issue, *see Oregon v. Bradshaw*, 462 U.S. 1039, 1045-46 (1983) (discussing "the *Edwards* rule"), one could easily come away with an impression that this Court must have jurisdiction given the majority's explanation of how the Fourth District misapplied *Edwards* to reach an incorrect result. However, none of the facts relevant to the majority's legal analysis are set forth in the *Shelly* opinion. Therefore, they cannot support the majority's exercise of jurisdiction. *See Gandy*, 846 So. 2d at 1144 (explaining that in "cases where the district court has not explicitly identified a conflicting decision, it is necessary for the district court *to have included some facts in its decision* so that the question of law addressed by the district court in its decision" is manifest within the four corners of the decision and can serve as a basis for conflict jurisdiction (quoting *Persaud*, 838 So. 2d at 532)).

As explained in *Reaves*:

> The only facts relevant to our [jurisdictional decisions] are those facts contained within the four corners of the decisions allegedly in conflict. . . . [W]e are not permitted to base our conflict jurisdiction on a review of the record . . . . Thus, it is pointless and misleading to include a comprehensive recitation of facts not appearing in the decision below.

*Reaves*, 485 So. 2d at 830 n.3. Applying this rule to the *Shelly* decision should end our jurisdictional review. The facts and law stated in the Fourth District's decision show that the issue raised to the Fourth District was simply whether Shelly's statements were the result of the officer's failure to cease interrogation after Shelly invoked his rights or whether Shelly reinitiated communication under *Edwards*. *See Shelly*, 199 So. 3d at 974. Given the Fourth District's summary conclusion that "Shelly . . . was the one who reinitiated communications with the officers," *id*., and inclusion of no facts from which a reader could question its resolution of the issue, *id*., we do not have jurisdiction to decide the issue. *Gandy*, 846 So. 2d at 1144; *Reaves*, 485 So. 2d at 830.[6]

_____

6. If the facts relied upon by the majority to find a *Miranda* violation in this case appeared on the face of the district court opinion, we would probably have jurisdiction based on some case in our precedent finding a *Miranda* violation under indistinguishable circumstances. However, *Welch* would not qualify as such a case. This Court concluded in *Welch* that the defendant reinitiated communication by asking a direct, unsolicited question about the investigation after being left alone for more than forty-five minutes. *Welch*, 992 So. 2d at 214. The circumstances of the reinitiation in *Welch* are not comparable to those of the instant

It should also be apparent from the majority's circuitous explanation of a conflict between *Shelly* and *Welch*, based upon a purported conflict between *Moss* and *Welch*, *see* majority op. at 18-25, that even if the majority's described conflict existed it would not be manifest "within the four corners of" the *Shelly* decision, *Reaves*, 485 So. 2d at 830, and it would not place *Shelly* in "direct" conflict with *Welch* as required by Florida's constitution before we can hear this case. *Mystan Marine, Inc. v. Harrington*, 339 So. 2d 200, 201 (Fla. 1976) ("The jurisdiction of this Court extends only to the narrow class of cases enumerated in [a]rticle V, [s]ection 3(b) of the Florida Constitution."). After all, even if *Moss* had preceded *Welch* and *Welch* had expressly overruled *Moss* on a different question of law, *Shelly* could have still pin-cited to the *Edwards* quote in *Moss* and this still would not have given rise to an express and direct conflict between *Shelly* and *Welch* "on the same question of law." Art. V, § 3(b)(3), Fla. Const. Indeed, although the majority asserts as its jurisdictional rationale that the *Shelly* court came into conflict with our precedent by citing the *Edwards* rule, the majority's merits decision in this case is based on its application of this very rule to facts not stated in the *Shelly* opinion. Majority op. at 31-34.

---

case and, therefore, do not control one way or the other the determination of whether it was Shelly or the detective who reinitiated communication.

- 41 -

Moreover, even the indirect and unexpressed conflict identified by the majority does not exist because *Welch* could not and did not reach the holding on which the majority's jurisdictional rationale is based.

The majority begins its conflict analysis by "hold[ing] that *Welch* is the correct standard when evaluating circumstances where an accused has invoked his or her right to counsel or silence and then subsequently has allegedly reinitiated communication with officers." Majority op. at 18 (emphasis added). Then, the majority sets out to explain the origin of the *Welch* "standard" and to contrast this new standard with what it describes and rejects as the incorrect rule set forth in *Moss*. Majority op. at 18-25. Ironically, the standard the majority rejects as incorrect is found in a single sentence in the *Moss* opinion that is not cited or addressed in *Shelly* and that simply quotes the standard dictated by the United States Supreme Court in *Smith v. Illinois*, 469 U.S. 91, 95 (1984). *Moss* states:

> [I]f the accused invoked his right to counsel, courts may admit his responses to further questioning only on finding that he (a) initiated further discussions with the police, and (b) knowingly and intelligently waived the right he had invoked.

60 So. 3d at 544 (quoting *Smith*, 469 U.S. at 95). How could a state court legally err by correctly quoting binding precedent from the United States Supreme Court on an issue of United States constitutional law, or how could this Court have adopted a different standard on this Fifth Amendment issue in *Welch*? *See Milk Control Bd.*, 169 So. at 544 (explaining that this Court is bound by decisions of the

- 42 -

United States Supreme Court on questions of United States constitutional law).[7]
Of course, neither proposition could occur.

Nevertheless, the majority opines that the *Moss* panel erred and came into conflict with *Welch* by quoting the United States Supreme Court's decision in *Smith* because *Smith* leaves out a purported independent third inquiry, supposedly recognized in *Welch* as an expansion of the rule set forth in *Smith*, majority op. at 24, that (c) "the accused be reminded of his or her rights" after he or she reinitiates communication. Majority op. at 19. The majority asserts that *Welch* gleaned this extra requirement from the United States Supreme Court's plurality opinion in *Bradshaw*, which was issued before the Court decided *Smith*. Majority op. at 20. In so concluding, the majority fails to explain how an earlier plurality opinion (*Bradshaw*) from the United States Supreme Court could trump a later majority opinion (*Smith*) from that Court on the same issue.

The majority does acknowledge that the supposed *Bradshaw* "standard is not explicitly stated in *Bradshaw*." Majority op. at 20. However, the majority fails to

---

7. Although this Court could develop a Florida standard governing the right against self-incrimination under article I, section 9 of the Florida Constitution, provided that the standard gives citizens at least as much protection as does the federal constitution, *Traylor v. State*, 596 So. 2d 957, 961 (Fla. 1992), that is not what occurred in *Welch*. *Welch* was a straightforward application of federal precedent to a Fifth Amendment issue with no reference to the Florida Constitution. *See* 992 So. 2d at 213-15.

acknowledge that *Bradshaw* unequivocally uses the same two-step analysis as *Smith*. *See Bradshaw*, 462 U.S. at 1044-46 (applying the "*Edwards* rule" as the first inquiry in this context and identifying "the next inquiry [as] 'whether a valid waiver of the right to counsel and the right to silence had occurred, that is, whether the purported waiver was knowing and intelligent and found to be so under the totality of the circumstances' " (quoting *Edwards*, 451 U.S. at 486 n.9)). Contrary to the majority's assertion, the United States Supreme Court has never articulated or implied a third inquiry or standard requiring that police "remind" the accused of his or her *Miranda* rights, in *Bradshaw* or any other case. Rather, both *Edwards* and *Bradshaw* make clear that the waiver issue involves a totality-of-the-circumstances test. *Bradshaw*, 462 U.S. at 1046 ("[T]he next inquiry was 'whether a valid waiver of the right to counsel and the right to silence had occurred, that is, whether the purported waiver was knowing and intelligent and found to be so *under the totality of the circumstances . . . .*' " (quoting *Edwards*, 451 U.S. at 486 n.9) (emphasis added)).[8] And, as explained below, this Court did not reach a different conclusion in *Welch*.

_____

8. As a practical matter, police would usually need to reinstruct the accused on his or her *Miranda* rights, after the accused's reinitiation of communication, to assure that the waiver is knowing and intelligent (and to be able to prove it later). This reminder was given in *Bradshaw, Smith, Welch,* and *Shelly*. However, it is easy to think of a circumstance where this reminder would be unnecessary to meet the totality-of-the-circumstances "valid waiver" test set forth in *Edwards* and *Bradshaw*.

*Welch* did not add to the two-step analysis required by the United States Supreme Court and did not create a new standard—which is the foundation of the majority's jurisdictional analysis. *Welch* was a direct appeal following a plea of guilty to two counts of first-degree premeditated murder (among other charges) and a penalty-phase trial in which Anthony Welch was sentenced to death for the two murders. 992 So. 2d at 208-09. This Court reversed, ordering a new penalty-phase trial due to an error in jury selection. *Id.* at 212-13. After thoroughly analyzing the jury selection issue, the Court "touch[ed] briefly on some of the remaining claims in order to provide guidance for the new penalty phase." *Id*. at 213. One of those issues was Welch's claim "that the trial court erred in denying his motion to suppress the incriminating confession he made at the Broward County Sherriff's Office." *Id.*

Welch was interviewed at the sheriff's office after waiving his *Miranda* rights. *Id*. He then announced that he no longer wanted to talk, and the first

---

For example, the accused could be a seasoned criminal defense attorney who reinitiated contact by reminding police of her profession and stating that she was fully aware of the *Edwards* rule and was reinitiating communication with full knowledge that she was waiving her right to counsel and other Fifth Amendment rights. In that scenario, the State could easily demonstrate a valid waiver irrespective of whether police reminded her of those rights. Under the new standard explained in the majority opinion, however, it appears that any statements made by the accused would still be suppressed unless police also independently reminded her of those rights. Majority op. at 19. This approach is misguided and inconsistent with the *Edwards* and *Bradshaw* totality-of-the-circumstances test.

interview concluded.  *Id.*  Welch, however, reinitiated communication and police again advised him of his *Miranda* rights before the second interview.  *Id.*  In its "brief touch" of the legal issues surrounding Welch's argument, the Court did not analyze the law in this area but simply summarized it.  *Id*. at 214 (summarizing *Miranda* and *Edwards*).  Then, citing *Bradshaw*, *Welch* states:

> [E]ven when an accused has invoked the right to silence or right to counsel, if the accused initiates further conversation, is reminded of his rights, and knowingly and voluntarily waives those rights, any incriminating statements made during this conversation may be properly admitted.

*Id*.  It made perfect sense for this Court in *Welch* to cite *Bradshaw* because the facts of the two cases appear legally indistinguishable, including the words used by each suspect to "reinitiate" communication.  *Compare Bradshaw*, 462 U.S. at 1043-44 (holding that suspect's unprompted question, "Well, what is going to happen to me now?" satisfied *Edwards* rule) *with Welch*, 992 So. 2d at 213-14 (citing *Bradshaw* and holding that suspect's unprompted question, "What is going to happen to me now?" satisfied *Edwards* rule).

The sentence quoted from *Welch* is accurate if viewed as summarizing a factually indistinguishable case in which the United States Supreme Court found no violation of a suspect's Fifth Amendment rights.  If viewed in this light, the quoted sentence from *Welch* is not inconsistent with the "standard" set forth in *Smith* and quoted in *Moss*—comprising two distinct and separate inquires.

*Bradshaw*, 462 U.S. at 1044-45 (explaining that *Edwards* rule is a "separate" inquiry that should not be "meld[ed] together" with the different and distinct question of whether, after the suspect reinitiates communication, "subsequent events indicate[] a waiver of the Fifth Amendment right to have counsel present during the interrogation"). The accuracy of this view is established both by what the *Welch* opinion says next and by what this Court did not say at all in that opinion.

Although *Welch* does not cite *Smith,* it does go on to conduct the same two-step analysis recited in *Smith* after its summary explanation of *Bradshaw*. "First," the Court concluded that Welch reinitiated communication with an unsolicited question almost identical to the unsolicited question in *Bradshaw*. *Id*. at 214. Then, in the next paragraph, the Court stated:

> Second, Welch's incriminating confession was made after a voluntary, knowing, and intelligent waiver of his *Miranda* rights.

*Id*. at 215. Although the Court discussed the fact that Welch was "again advised of his *Miranda* rights," this observation was made in support of its conclusion that Welch's waiver of his *Miranda* rights was valid—the same analytical framework used in *Bradshaw*, summarized in *Smith*, and quoted in *Moss*. *See id*.

Significantly, nowhere in its "brief touch" on this issue did this Court hint that it was creating a new standard that "expands the requirements of," majority op. at 24, the very analytical framework that it employed. The majority's conclusion

that this is how *Welch* should be read, which is the basis for its jurisdictional determination, is incorrect. Because this Court cannot change the requirements of federal law—by expansion or otherwise—it should be clear that *Welch* did not add a requirement to the federal framework for addressing the issues resolved in *Welch* and, consequently, that the majority's basis for reviewing this case—conflict between *Welch* and the *Moss* court's citation of binding United States Supreme Court precedent—is invalid. *See supra* p. 41-42.

Finally, that the majority reaches outside the bounds of our constitutional authority to take this case is evident because the majority bases its jurisdictional determination on issues that were not argued—and, therefore, not decided—below. Shelly's arguments to the Fourth District (and this Court) focused on the reinitiation question—the *Edwards* rule—and not the separate question of whether a knowing and intelligent waiver of his Fifth Amendment rights followed any such reinitiation. Consequently, that separate totality-of-the-circumstances inquiry is not an issue properly before this Court—and the same would be true of the supposed *Welch* requirement that police remind the suspect of *Miranda* rights. Shelly never raised that as an issue for review because it was not implicated by the facts of the case (as the police *did* restate the *Miranda* warnings). Therefore, the majority should not have based its jurisdictional determination on a purported conflict on a question of law that the Fourth District did not address. In fact,

irrespective of the label it uses, the majority's adoption of a new standard under the guise of a jurisdictional analysis is dicta resolving a purported conflict that does not appear in the four corners of the Fourth District's decision and is not even germane to an issue presented to this Court for review in the merits briefs. *State v. Yule*, 905 So. 2d 251, 259 n.10 (Fla. 2d DCA 2005) ("A holding consists of those propositions along the chosen decisional path or paths of reasoning that (1) are actually decided, (2) are based upon the facts of the case, and (3) lead to the judgment. If not a holding, a proposition stated in a case counts as dicta.") (Canady, J., specially concurring) (quoting Michael Abramowicz & Maxwell Stearns, *Defining Dicta*, 57 Stan. L. Rev. 953, 1065 (2005)); *New Port Largo, Inc. v. Monroe County*, 985 F.2d 1488, 1500 n.7 (11th Cir. 1993) (explaining that even a statement labeled as a holding is not a holding unless it decides a matter that "was squarely presented *by the facts of the case* and was a proposition that absolutely must have been decided to decide the concrete case then before the court") (Edmonson, J., concurring specially) (emphasis added).

The majority reads a conflict into the Fourth District's decision by pointing out the Fourth District's conclusion that Shelly reinitiated communication with the officers and then explaining, in reliance on *Welch*, that whether the accused reinitiates communication after invoking his right to silence or counsel is not the end of the inquiry when the accused argues on appeal that his confession should

- 49 -

have been suppressed because he invoked his right to an attorney. Majority op. at 18-25. This approach to express-and-direct conflict jurisdiction overlooks the limited role Florida's appellate courts have in addressing trial-court error. The district court in this case was required to rule only on the issues properly raised and argued by Shelly in his appellate briefs. *See City of Miami v. Steckloff*, 111 So. 2d 446, 447 (Fla. 1959) ("It is an established rule that points covered by a decree of the trial court will not be considered by an appellate court unless they are properly raised and discussed in the briefs."); *see also Bainter v. League of Women Voters of Fla.*, 150 So. 3d 1115, 1126 (Fla. 2014) (" 'Basic principles of due process'—to say nothing of professionalism and a long appellate tradition—'suggest that courts . . . ought not consider arguments outside the scope of the briefing process.' " (quoting *Powell v. State*, 120 So. 3d 577, 591 (Fla. 1st DCA 2013))); *Rigterink v. State*, 66 So. 3d 866, 897 (Fla. 2011) (declining to address whether an alleged error was fundamental because the appellate brief did not argue that it was); *Fla. Emergency Physicians—Kang & Assocs., M.D., P.A. v. Parker*, 800 So. 2d 631, 636 (Fla. 5th DCA 2001) (noting the well-settled rule that appellate courts "do not address issues not clearly set out in the issues on appeal"). It is clear from the four corners of the Fourth District's opinion that Shelly raised a narrow issue to the Fourth District: whether the officers violated his right to counsel by reinitiating communication with him after he invoked that right. *See Shelly*, 199 So. 3d at 974.

Having received the record after jurisdiction was improvidently granted in this case, we can confirm that Shelly's Fourth Amendment argument to the district court was as narrow as the opinion indicates. In ruling on Shelly's motion to suppress, the trial court identified the pertinent inquiries as (1) whether Shelly's confession resulted from the detective's failure to scrupulously honor Shelly's invocation of his right to remain silent or from Shelly's reinitiation of communication and (2) whether, after any such reinitiation, Shelly's decision to waive his rights again was voluntary, knowing, and intelligent. The trial court found in favor of the State as to each inquiry, and Shelly's appellate argument focused on the first inquiry, involving Shelly's lack of "reinitiation" under the governing standards. Given Shelly's limitation of his appellate argument, the district court was not required to address anything further and, in fact, would have been in error to do so. *See Sebo v. Am. Home Assurance Co.*, 208 So. 3d 694, 699 n.2 (Fla. 2016) (opining that the district court improperly decided an issue where it was neither preserved in the trial court nor raised to the district court); *Steckloff*, 111 So. 2d at 447. And, given this limited role of an appellate court, the district court's failure to address anything beyond the reinitiation of communication does not expressly and directly conflict with any case law discussing the second inquiry.

Ultimately, from the four corners of the *Shelly* decision, it is clear that the issue that was raised and decided was simply whether error occurred at the first

step of the *Edwards* test, not whether any subsequent waiver was valid under *Welch*. *See id*. Because conflict must appear on the face of the two decisions being compared to be express and direct and therefore empower this Court to exercise jurisdiction, *Reaves*, 485 So. 2d at 830, the Florida Constitution dictates that we discharge this case irrespective of our view of the merits or importance of the issue that would otherwise be presented. *See* art. V, § 3(b)(3), Fla. Const.

CANADY, C.J., and POLSTON, J., concur.

Application for Review of the Decision of the District Court of Appeal – Direct Conflict of Decisions

      Fourth District - Case No. 4D14-1910

      (Indian River County)

Cathy A. Williams of Law Office of Cathy A. Williams PLLC, Cornelius, North Carolina; and Thomas J. Seider of Brannock & Humphries, Tampa, Florida,

      for Petitioner

Pamela Jo Bondi, Attorney General, Tallahassee, Florida, Celia A. Terenzio, Chief Assistant Attorney General, Cynthia L. Comras, Luke R. Napodano, and Donna M. Perry, Assistant Attorneys General, West Palm Beach, Florida,

      for Respondent