DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**ZACHARY JOSEPH PENNA,**
Appellant,

v.

**STATE OF FLORIDA,**
Appellee.

No. 4D20-345

[December 22, 2021]

Appeal from the Circuit Court for the Fifteenth Judicial Circuit, Palm Beach County; Caroline C. Shepherd, Judge; L.T. Case No. 502016CF006304A.

Carey Haughwout, Public Defender, and Paul Edward Petillo, Assistant Public Defender, West Palm Beach, for appellant.

Ashley Moody, Attorney General, Tallahassee, and Heidi L. Bettendorf, Senior Assistant Attorney General, West Palm Beach, for appellee.

GERBER, J.

The defendant appeals from his convictions for two counts of first-degree murder, one count of robbery with a weapon, and one count of false imprisonment with a weapon. Despite the horrible facts underlying these convictions, we are compelled to reverse these convictions and remand for a new trial due to a violation of the defendant's *Miranda* rights.

After the defendant had invoked his *Miranda* rights, but later made spontaneous statements regarding his crimes to a deputy guarding him at a hospital, the deputy failed to specifically give the defendant his *Miranda* rights again before asking him questions which were reasonably likely to elicit, and did elicit, incriminating responses which the state presented at trial in their entirety. Because those elicited incriminating responses proved and/or corroborated each of the crimes, and further undermined the defendant's insanity defense, the trial court erred in denying certain portions of the defendant's pre-trial motion to suppress his incriminating responses. This error was not harmless. Thus, we must reverse and remand for a new trial.

We present this opinion in six sections:
1. The crimes and their aftermath;
2. The conversations at issue;
3. The defendant's pre-trial motion to suppress;
4. The defendant's insanity evidence and the jury's verdict;
5. The parties' arguments on appeal; and
6. Our analysis.

## 1. *The Crimes and Their Aftermath*

The crimes occurred on November 20, 2015. The defendant stabbed two men to death at the men's home in Palm Beach County. The defendant then stole the men's SUV, and drove to a nearby neighborhood where, at knife point, he robbed an elderly woman of her shirt and purse while she walked down the street. The defendant then drove to a co-worker's house in another neighborhood where, at knife point, he forced the co-worker into the SUV and attempted to flee in the SUV.

When the defendant stopped at a fast-food restaurant, the co-worker was able to escape from the SUV. The defendant resumed driving north on I-95. When he reached Brevard County, he stopped the SUV, and tried to take another man's car. When the man resisted, the defendant stabbed the man (who survived), and fled into the woods. When a police dog was sent into the woods after the defendant, he stabbed the dog (which survived). The defendant later charged out of the woods towards the police while still holding the knife. The police shot the defendant four times, but he survived and was taken to a hospital for treatment.

At the hospital the next day, while the defendant remained in custody, the lead Palm Beach County detective read *Miranda* warnings to the defendant and attempted to question him. However, the defendant requested a lawyer. The lead detective left the room. Despite the defendant having requested a lawyer, a second detective entered the defendant's room and attempted to question him. The defendant again requested a lawyer. The detectives then ceased their attempts to question the defendant. (The second detective's improper attempt to question the defendant is not the *Miranda* violation at issue in this appeal.)

Nearly four weeks later on December 17, 2015, while the defendant remained in custody at a Brevard County hospital, one of the deputies guarding the defendant called the local police to ask whether the defendant had been read his *Miranda* warnings and whether they wanted him to obtain statements from the defendant. The local police (who apparently

2

were investigating the Brevard County crimes) said they did not need any assistance, but the Palm Beach County detectives might.

The deputy then called the Palm Beach County detectives. One of the Palm Beach County detectives (not the lead detective) told the deputy that the defendant had refused to speak to them and that he had requested counsel.

Despite that notification, when the defendant initiated a conversation with the deputy later that day, and on other days in the weeks which followed, the deputy did not specifically give the defendant his *Miranda* rights again, even though the deputy directed questions to the defendant during those conversations. Some of the deputy's questions, from an objective standpoint, were not reasonably likely to have elicited incriminating responses from the defendant. However, other questions were reasonably likely to elicit, and did elicit, incriminating responses from the defendant.

The deputy's typed recordings of those conversations, which the state later disclosed to defense counsel in discovery, became the subject of the defendant's pre-trial motion to suppress. We will discuss each conversation in detail in the next section, before addressing each conversation's legality, or lack thereof, later in this opinion.

## 2. *The Conversations at Issue*

December 17, 2015

The defendant spontaneously asked the deputy why he (the defendant) was in the hospital. The deputy replied, "You don't know why you are here?" The defendant shook his head, turned away, and closed his eyes.

About thirty minutes later, the defendant spontaneously stated, "I stabbed a couple of people." The deputy replied, "You stabbed a couple of people?" The defendant responded, "Yeah a couple of f*** and a damn dog."

December 19, 2015

The defendant spontaneously said he was in a bad mood. When the deputy asked the defendant why he was in a bad mood, the defendant responded, "Dude, I'm f*****. I feel like I just f***** my life up." The deputy asked the defendant, "Why do you think you f***** your life up?" The defendant responded, "Dude, I'm just f*****. I know what I did. I'm going

3

to prison for my whole f****** life." The defendant then recited Bible scriptures and stated that his life in prison would be horrible. The defendant further stated several times he was upset about having to go to jail for life at such a young age. The defendant also admitted to having used marijuana, cocaine, and ecstasy, and stated, "Dude, I've tried it all."

December 20, 2015

The defendant and the deputy were engaged in a conversation about miscellaneous topics when the defendant spontaneously asked, "What do you think I will get?" The deputy asked the defendant what he meant. The defendant responded, "[W]hat do you think I will get for killing those two f***?"

The deputy asked the defendant "What do you mean, what do you think you're being punished for?" The defendant responded that the story was more complicated than the deputy thought. The defendant said he would let the deputy know the entire story of what happened.

The deputy told the defendant, "Hey, I'm a law enforcement officer and you can say anything you want to me, but I'm going to write it down." The deputy also told the defendant that he (the deputy) would be typing what the defendant was saying on his laptop. However, the deputy did not specifically give the defendant his *Miranda* rights again. Instead, the deputy told the defendant, "I don't want you to tell me anything unless you want to talk to me." The deputy also said, "Well you know, I'm in uniform. I'm here. And if you want to have a conversation, we could talk. But … as far as specific crimes … I'm not going to ask you specific questions about specific crimes."

The defendant proceeded into a lengthy narrative about the crimes. He said that, on the day of the crimes, his car had a flat tire and he had to walk to his aunt's home where he was temporarily staying. He wanted a car, so he went to a nearby home where an SUV was parked and knocked loudly on the home's front door. A man opened the door and said, "What?" The defendant threatened the man with a folding knife and told the man to give him the keys to the SUV. When the man refused, the defendant lunged towards the man and stabbed him several times. The man fell backwards and yelled, "Get the gun!" to a second man inside the house.

While the defendant continued stabbing the first man, the second man approached with a baseball bat and struck the defendant in his upper right arm and wrist, causing a large gash to the defendant's wrist. The second man hit the defendant again with the baseball bat, this time in the

head.  The defendant turned towards the second man and chased him into the house.  When the defendant caught up to the second man, the defendant began stabbing the second man until he believed the second man was possibly dead.  The defendant said he stabbed both men "one hundred times." (The defendant had stabbed the first man fourteen times, and had stabbed the second man eighteen times.)

While covered in blood from the stabbing, the defendant decided to drink the two men's blood "just because."  When the deputy asked the defendant what the blood tasted like, the defendant said, "silvery and like iron."  The defendant then detailed how he took the men's SUV and drove around to locate vehicle tags to remove from other cars so he could switch them because he feared being caught by the police.

The defendant also said he needed a clean shirt.  He approached an elderly woman walking down the street, and threatened her with the same knife which he had just used in the stabbings.  He told her to remove her shirt and give him her shirt and purse.

The defendant then drove to a co-worker's house to trick the co-worker into getting into the SUV with him.  When the defendant arrived at the house, he knocked on the door, told the co-worker he had just been jumped by several men, and needed to come inside to borrow a shirt.  The co-worker opened the door and, once the defendant was inside, the defendant threatened the co-worker with the knife and demanded the co-worker go with him and drive to New York or North Carolina and "search for God's redemption."  The co-worker later fled from the defendant.

The defendant then drove to I-95 to try to get to North Carolina or New York, because he had "people" in both places.  As the defendant drove up I-95, he noticed the SUV was low on gas.  He exited I-95 but he had only ten dollars.  He saw a man working on the side of the road.  The defendant demanded the man hand over the keys to his vehicle.  When the man refused, the defendant stabbed and slashed the man several times with the same knife before the man tried to flee.  The defendant chased the man and tried to stab him again.

The defendant then heard sirens in the distance and observed an emergency vehicle coming towards his location.  He fled the area and wanted "to be hunted like the Aztecs."  After hiding from the police, he saw a K9 approaching his location.  When the K9 approached, "the f****** dog liked me, but tried to bite me."  The defendant slashed at the dog and tried to stab it.  The K9 retreated and then came back in the defendant's direction.  The defendant advanced toward the officers and was shot.  The

5

defendant said he "wasn't ready to die and God told him he wasn't ready for him yet." The defendant began to laugh at the officers and still tried to move when "they f****** tased me, and that s*** f****** hurt like hell."

December 25, 2015

The defendant began asking the deputy questions about prison and how much time he could get for the crimes which he committed. The deputy asked the defendant, "What crime do you think you'll get the most time for?" The defendant responded he believed that stabbing the two men and drinking their blood would mean prison for life. The deputy then asked the defendant what his second worst crime was. The defendant responded running from the police and stabbing the K9, which he thought was as bad as stabbing a police officer. The defendant then asked the deputy if drinking the victims' blood was a serious crime. The deputy replied he was unsure if an enhancement would be added to the crime.

The defendant then asked about the elderly woman from whom he took the shirt and purse. The defendant said he felt bad because she was old. The defendant admitted he knew the police were looking for him and that was why he was searching for tags in several neighborhoods and was looking for a place to hide from the police when he went to the "mansion" and stayed there before driving towards I-95. The defendant also described how he was angry about having to walk from where his vehicle's flat tire had left him stranded, his relationship with his aunt, and the initial voices which he said was God telling him to "complete his word."

The deputy asked the defendant if God's voice guided him in every crime which he committed. The defendant stared at the deputy for a few seconds, and then said once he stabbed the two men and stole their SUV, he knew he was "f*****."

The deputy asked the defendant if he considered turning himself into the police or just stopping and calling for help. The defendant responded he did not want to stop and just said it was "too late to stop there."

The defendant then began to ask about prison and where he might be sent. The deputy replied that a judge would assign his location. The defendant then asked if he would be in special housing for people who "committed murders, two of them?" The deputy replied he did not think so. The defendant said he was not in a great mood because he was going to prison and was not looking forward to spending life in prison, but he knew he was meant to live and was told by God he was not going to die from killing people and stabbing a dog because God said it wasn't his time.

6

The defendant again asked if the deputy thought he was going to prison. The deputy asked the defendant what he thought his sentence might be for his crimes. The defendant responded, "I know I will spend life in prison for killing the two guys and for trying to kill the dog and other people." The defendant asked if the deputy thought he (the defendant) was fortunate to have been reborn. The deputy asked what the defendant's interpretation of being reborn was. The defendant responded, "Dude, I got shot four times, and I am still here," and that makes him reborn with a purpose. The deputy asked the defendant if he saw himself as a bad person. The defendant did not answer, but instead looked at the television and then asked what the deputy knew about the Egyptian religion Ra. The deputy replied he was not aware of the religion. The defendant responded he began practicing the religion several months earlier and was very excited about learning the ways of Ra.

The defendant then stated that, on the day of the crimes, after his car had flat tires, he began to hear voices telling him to "do what I am telling you or your family is gonna die." The defendant further said, "Once I stabbed the guys at the house and drank the blood, I knew I just gotta keep going."

The deputy asked if the defendant knew the law regarding taking a life. The defendant responded, "Dude, I was following the voices." The defendant then said, "I could get out you know, they could say I'm crazy but I know what the f*** is going on." The defendant again said he knew what was going on, but was excited because he "watched plenty of f****** cop shows."

The defendant then began to stare in the deputy's direction for a long period of time, before saying, "[Deputy], you're f****** okay dude." At that point, the defendant said he was tired of talking and said he was going to take a nap until he was taken to jail.

### 3. *The Defendant's Motion to Suppress*

Before trial, the defendant filed a motion to suppress all of the statements which he made to the deputy because, even though the defendant had reinitiated communications with the deputy, the deputy's resulting questioning of the defendant, without having specifically given the defendant his *Miranda* rights again, violated his *Miranda* rights, as the Florida Supreme Court held in *Shelly v. State*, 262 So. 3d 1 (Fla. 2018).

The state filed a written response arguing that all of the defendant's statements to the deputy were spontaneous and not the result of custodial interrogation.

At the hearing on the motion, the lead detective and the deputy both testified about their interactions with the defendant, as recited above.

The trial court denied the defendant's motion to suppress, reasoning that the defendant had initiated all of his conversations with the deputy. The trial court stated:

> [T]he key, for me, is the fact that [the deputy] did not [initially] question him. That every time there was a conversation it was initiated by [the defendant]. And that [the deputy] would paraphrase or repeat verbatim what [the defendant] had said, but forming it … in a question. And then [the defendant] would elaborate or would continue and say further things. And sometimes [the deputy] followed up with questions, but only after [the defendant] initiated the conversation. And each time that there was a renewed conversation it was never at the initiation of law enforcement. And because of that, all those statements that [the defendant] made are admissible and will be allowed in the State's case.

### 4. *The Defendant's Insanity Defense and the Jury's Verdict*

At trial, the state called several witnesses whose testimony proved that the defendant committed the charged crimes. These witnesses included the deputy who, consistent with the motion to suppress testimony, testified about his numerous conversations with the defendant, including the defendant's lengthy recitation of having committed the crimes and fleeing, and his repeated concerns regarding his anticipated punishment.

Defense counsel did not dispute that the defendant committed the charged crimes. Instead, in accordance with a pre-trial notice filed pursuant to Florida Rule of Criminal Procedure 3.216, defense counsel presented an insanity defense.

In support of the insanity defense, defense counsel presented several witnesses. Defense counsel first presented one of the officers whom the defendant attacked when he ran out of the woods towards the police while still holding the knife. The officer testified that after the defendant was shot, the defendant was "laying on the ground[,] reasonably incoherent,

and he was manipulating his genitalia." The defendant then began laughing and, when he refused to show his hands, had to be tasered.

Defense counsel next called several of defendant's family members to testify regarding his mental illness history. The defendant's mother, a registered nurse, testified that the defendant's father, who had died when the defendant was fifteen, had a history of psychiatric hospitalizations and drug addiction. After the defendant's father died, he began to see a psychologist and then, because he needed medications, a psychiatrist. The defendant was treated throughout high school. After high school, he went to college, but his mental health got worse, and he lasted only one semester. He had to be hospitalized for three days and later for three weeks. He could not keep a job. His behavior could be bizarre: "He would pace, he would cry, he would stay in his room. He would … rock and pace. He'd lay on my bed and cry. And sleep on the floor." One year before the crimes, he stopped taking his medications. On the day of the crimes, he called his mother to say he was walking home because his car was not ready. She testified he did not sound irrational at that time. After the crimes, she visited him in the hospital. He talked about what happened, but appeared "weirdly confused." He also would kick off his covers and expose himself. She testified he had never been violent before, nor had he ever carried a weapon. However, she admitted having told the lead detective that although the defendant had expressed violent fantasies, he knew the difference between fantasy and reality.

The defendant's stepfather's testimony reiterated much of the mother's testimony. The stepfather also testified that the defendant would "talk about things that were kind of not reality." The stepfather saw the defendant three days before the crimes. The defendant appeared agitated and nervous.

The defendant's aunt testified he had lived with her two years before the crimes. During that time, he was under a psychiatrist's care, was taking his medicine, and never behaved violently. However, he also would often read the Bible and talk about angels.

The defendant's grandmother testified he also had lived with her two years before the crimes. She testified he was more anxious when he was not on his medications, but was never violent.

The defendant's sister testified he also had lived with her in the two years before the crimes. She testified that when he was taking his medications he was normal, but when he was not taking his medications he was "depressed and lost and just not know who he is or what he's

9

supposed to be doing or where he belongs in this world." She also testified she had never seen him behave violently.

Defense counsel also called the defendant's manager from an alarm company which had employed the defendant for three weeks. The manager testified that on the day of the crimes, the defendant was distracted and bothered at work.

Defense counsel then called two expert witnesses, a psychologist and a psychiatrist, each of whom testified that the defendant suffered from a major mental illness which prevented him from rationally understanding his actions on the day of the crimes.

The psychologist had examined the defendant in March 2016, three months after the crimes. The psychologist testified that, at that time, the defendant was "floridly acutely psychotic," "[v]irtually unintelligible," "delusional, [and] had persecution religious delusions of grandeur. His speech was extremely disorganized, pressured, rapid." The psychologist opined the defendant looked as a person would look when actively psychotic and unmedicated. At that time, the defendant was not competent to stand trial and needed anti-psychotic medication. A month later, the defendant was behaving better. He was more responsive, but he was still "extremely disorganized, tangential, pressured speech, thought racing. Lots of delusional material that was not very well integrated ...." At that time, he was taking anti-psychotic and anti-depressant medications, but he was still suffering from delusions and psychosis. He spoke of "aliens, the sun God Ra, pyramids." He said he was the "daughter of the sun God Ra ... mixed up with some Christian apocalyptic kinds of material as well." His statements were a jumble of "Egyptian theology and a Christian theology that ... got symbolized ... by the idea of ... blood sacrifice; a ring that he had that ... had a serpent on it ... and believing that he had been empowered by God ... with the ring." He believed that because of the "special powers that were imbued upon him ... he wouldn't suffer death."

The psychologist opined that the defendant was not fabricating or malingering. The psychologist concluded the defendant had bipolar disorder or bipolar type schizoaffective disorder. The psychologist based this conclusion on the fact that the defendant was responding to command hallucinations and thought he was controlled by a higher power. The fact that the defendant's father was bipolar increased his chances of being bipolar from 1 in 10,000 to 1 in 10.

10

In the psychologist's opinion, the defendant was psychotic on the day of the crimes, and did not think what he was doing was wrong because he was operating under a delusional belief system. Thus, the psychologist concluded, the defendant was legally insane on the day of the crimes, because he was suffering from a significant mental illness which prevented him from rationally understanding his actions.

Defense counsel next called the psychiatrist. The psychiatrist examined the defendant in April 2017 (eighteen months after the crimes) and October 2018 (almost three years after the crimes). The psychiatrist opined that the defendant suffers from a major mental illness which renders him out of touch with reality, and he was out of touch with reality on the day of the crimes. The psychiatrist concluded the defendant has schizoaffective disorder, which includes both schizophrenia and bipolar elements. The bipolar elements are depression and mania; and the schizophrenia elements are delusions, hallucinations, and thought disorders.

The psychiatrist testified the defendant believed he had special connections and powers to the Holy Ghost and to other spiritual forces. He "was not using logical thinking, and … was referring to ideas and beliefs which were religiously oriented; but were also so extreme and contradictory … that they represented thought disorder and delusion." The psychiatrist concluded that the defendant met the legal criteria for insanity during the commission of the crimes.

In rebuttal, the state called a different psychiatrist as an expert witness. The state's psychiatrist opined the defendant has a personality disorder, but was sane at the time of the crimes. According to the state's psychiatrist, the defendant has a "mixed personality disorder" with antisocial (law-breaking), borderline (fluctuating moods, impulsivity), and dependent (overly dependent on others) features. The state's psychiatrist testified those features do not constitute a major mental illness. He further opined the defendant's medical records did not show signs of schizoaffective or bipolar disorder, because the records did not document any manic episodes.

Regarding the psychotic symptoms which the defendant reported to the defense's psychologist, the state's psychiatrist testified that a schizophrenic or psychotic person typically does not have so many different ideas, and is usually limited to specific delusional thinking. The state's psychiatrist could not rule out substance abuse as a possible contributor to the defendant's behavior, based on physical symptoms

which the defendant reported at the hospital and his self-reported use of MDMA or Ecstasy.

The state's closing arguments repeatedly used the defendant's statements to the deputy to prove the defendant was sane at the time of the crimes. During the state's initial closing, the prosecutor argued:

- "The actions that he took, the words that he said, [']I can get out, you know, they can say I'm crazy, but I know what the f*** is going on.['] That's what he said ... to [the] [d]eputy, amongst all the other things that he said. He knew what was going on. He knew that he could get out of this if he acts crazy."

- "Look at the statements that he made to [the] [d]eputy ... in detail. [']I killed two [f***] and a dog. I'm f*****. I f***** up my whole life. I know what I did. I'm going to prison for the rest of my life.['] If you don't know what you were doing was wrong, what are you talking about prison for? Again, he recounts detailed events, telling [the] [d]eputy ... what he did [in] fear of being located by the police."

Further, during the state's rebuttal closing, the prosecutor argued:

- "All you have to do is look at his actions and his words."

- "Violence does not equate to legal insanity. What are his words? What are his actions?"

- "Words and actions. What are his words? [']I stabbed two [f***] and a damn dog.['] Hmm. He is able to discern, in a matter of several minutes, that the two men that he stabbed to death are homosexuals. He's able to consciously understand that and discern it, and remember it when he's sitting there talking to [the deputy]. That's the fully blown psychotic break? That's being insane?"

- "[W]e know somebody who he did talk to. He didn't say all these weird things to [the deputy]. ... Now, just because he tells a law enforcement officer things that he did, whatever reason. Did he feel some remorse at that time? Was he bragging? Was he testing his [insanity defense] theory that he was going to use some day in the future, like today?"

- "He knew exactly how wrong it was. He told [the deputy], [']I robbed that old lady.['] His words, [']I robbed.[']"

- "His words.  He knows what's going on.  [']I've watched plenty of cop shows.  Say I'm crazy, but I know what the f*** is going on.  I could get out, you know.[']  Those are his words, those are his actions."

The jury found the defendant guilty as charged of all four crimes committed in Palm Beach County against the two murdered men, the elderly woman, and the defendant's co-worker, thereby rejecting the defendant's insanity defense.  This appeal followed.

## 5. *The Parties' Arguments on Appeal*

The defendant primarily argues the trial court erred in denying his motion to suppress all of the statements which he made during the several conversations with the deputy at the hospital.  More specifically, the defendant argues after he had invoked his *Miranda* rights, but later made spontaneous statements regarding his crimes to the deputy, the deputy failed to specifically give the defendant his *Miranda* rights again before asking him questions which were reasonably likely to elicit, and did elicit, incriminating responses which the state presented at trial in their entirety.  According to the defendant, "It is no exaggeration to say that [the deputy's] testimony was the centerpiece of the State's case."  Therefore, the defendant argues, the trial court's error in denying the defendant's motion to suppress was not harmless beyond a reasonable doubt.

The state responds the trial court properly denied the defendant's motion to suppress.  According to the state, all of the defendant's statements to the deputy at the hospital were admissible because he made the statements spontaneously, without prompting or interrogation, and some of those statements occurred during conversations which were not related in any way to the crimes.  The state further argues that the deputy's decision to memorialize the defendant's statements on a laptop in front of the defendant, respond to the defendant's inquiries, and continuing to let him speak without being prompted, did not transform their interactions into interrogations.

In rebuttal, the defendant challenges the state's characterization of the deputy's interactions with him, arguing the interactions show that the deputy asked the defendant "question after question after question."  Further, the defendant argues, even if he voluntarily made ambiguous statements, the deputy was limited to asking follow-up questions in a neutral effort to clarify what had already been said, but could not expand the scope of the statements previously made.

13

## 6. *Our Analysis*

While the parties' arguments to the trial court, and to us, have sought an "all or none" disposition of the defendant's motion to suppress (to which the trial court adhered by admitting the defendant's statements in their entirety), we conclude the correct analysis should have been to separately address each of the defendant's statements.

Applying a statement-by-statement analysis, we conclude the trial court correctly admitted the defendant's spontaneous (i.e., unelicited) statements, as will be specifically described below. However, because the deputy failed to specifically give the defendant his *Miranda* rights again before expanding the conversation to ask him questions which were reasonably likely to elicit, and did elicit, incriminating responses, the trial court erred in admitting those elicited incriminating responses, as will be described below. Further, because those elicited incriminating responses proved and/or corroborated each of the crimes, and further undermined the defendant's insanity defense, the trial court's errors were not harmless.

Our analysis will begin with the standards applicable to circumstances where an accused has invoked their right to counsel (or silence) and then later reinitiates communication with officers. We then will apply those standards to each of the defendant's statements during the several conversations with the deputy. Lastly, we will explain why the trial court's errors in admitting the elicited incriminating responses were not harmless.

### a. *Standard of Review and Applicable Law*

"Appellate courts should … accord a presumption of correctness to the trial court's rulings on motions to suppress with regard to the trial court's determination of historical facts, but appellate courts must independently review mixed questions of law and fact that ultimately determine constitutional issues arising in the context of the … Fifth Amendment …." *Shelly v. State*, 262 So. 3d 1, 14 (Fla. 2018) (brackets and citation omitted); *see also Middleton v. State*, 220 So. 3d 1152, 1179 (Fla. 2017) ("A trial court's decision to deny a motion to suppress comes to [an appellate court] cloaked with a presumption that its factual findings are correct, but [the appellate court] appl[ies] a de novo standard of review to legal issues and mixed questions of law and fact which ultimately determine constitutional issues.").

In *Miranda* [*v. Arizona*, 384 U.S. 436, 479 (1966)], the United States Supreme Court determined that the Fifth … Amendment prohibition against self-incrimination requires advising a prospective defendant of the

14

right to remain silent and also the right to the presence of counsel. *Shelly*, 262 So. 3d at 14 (citation omitted). "After being advised of these rights, if an accused indicates a wish to remain silent, 'interrogation must cease.'" *Id.* (quoting *Miranda*, 384 U.S. at 474) (other citation omitted). Further, "[a]fter a suspect invokes [their] *Miranda* rights, police officers are prohibited from engaging in words or actions that the officers should know are reasonably likely to elicit an incriminating response from the suspect." *Shelly*, 262 So. 3d at 14 (citation and internal quotation marks omitted); *see also Rhode Island v. Innis*, 446 U.S. 291, 301 (1980) ("A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect … amounts to interrogation.").

However, where a suspect has invoked their *Miranda* rights, the suspect remains free to volunteer a statement to police on the suspect's initiative at any time, on any subject, in the absence of counsel. *Traylor v. State*, 596 So. 2d 957, 966 (Fla. 1992). But if the police wish to reinitiate interrogation at that point, the Florida Supreme Court has imposed an additional requirement: "[E]ven when an accused has invoked the right to silence or right to counsel, if the accused initiates further conversation, *is reminded of his* [*Miranda*] *rights*, and knowingly and voluntarily waives those rights, any incriminating statements made during this conversation may be properly admitted." *Shelly*, 262 So. 3d at 11 (quoting *Welch v. State*, 992 So. 2d 206, 214 (Fla. 2008) (citing *Oregon v. Bradshaw*, 462 U.S. 1039, 1045-46 (1983))).

The Florida Supreme Court in *Shelly* proceeded to explain why it was requiring the police to remind the accused of their *Miranda* rights before interrogation is reinitiated:

> The standard in *Welch* is derived from *Bradshaw*. Although the standard is not explicitly stated in *Bradshaw*, the facts of the case outline that which would become the standard articulated by this Court in *Welch*. Bradshaw was questioned during an investigation of the death of a person whose body had been found in Bradshaw's pickup truck. Bradshaw was advised of his *Miranda* rights and admitted to providing the victim with liquor for a party but denied involvement in the traffic accident that killed the victim. Bradshaw was then arrested for providing liquor to the victim, a minor, and was again advised of his *Miranda* rights. An officer then stated to Bradshaw his theory which placed Bradshaw behind the wheel of the vehicle. Bradshaw again denied his involvement and then stated, "I do want an attorney before it goes very much further." The officer then

immediately terminated the interrogation. Sometime later, Bradshaw inquired to a police officer, "Well, what is going to happen to me now?" The officer responded, "You do not have to talk to me. You have requested an attorney ...." A conversation followed in which Bradshaw agreed to take a polygraph examination, stating he was willing to do whatever he could to clear up the matter. Bradshaw was again reminded of his *Miranda* rights and ultimately recanted his earlier story, admitting he was the driver of the vehicle in which the victim was killed. The Oregon Court of Appeals held that Bradshaw's inquiry of what would happen to him did not "initiate" a conversation with the officer, and that therefore his eventual incriminating statements should have been excluded under *Edwards* [*v. Arizona*, 451 U.S. 477, 485 (1981) (a defendant who has "expressed his desire to deal with the police only through counsel is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiated further communication, exchanges, or conversations with the police")]. The United States Supreme Court reversed, holding that *Edwards* did not stand for the proposition that the initiation of a conversation by an accused after having invoked the right to counsel amounts to a waiver of the right to counsel. Rather, a two-step process is involved – after finding no *Edwards* violation, the inquiry is whether, under the totality of circumstances, the accused made a knowing and intelligent waiver of the right to counsel. The Court further held that, in asking "Well, what is going to happen to me now?," Bradshaw had "initiated" further conversation for purpose of the *Edwards* rule.

Likewise, in *Welch*, this Court held that Welch's statements were admissible because they were made pursuant to a voluntary, knowing, and intelligent waiver. Welch was advised of his *Miranda* rights during an interrogation concerning a double homicide. After some interrogation Welch invoked his right to silence and the interrogation stopped. Welch was left alone for forty-five minutes before asking a detective, "What is going to happen to me now?" Welch was *readvised* of his *Miranda* rights before detectives began interrogating him again, which led to Welch ultimately making a confession. This Court held that "even when an accused has invoked the right to silence or right to counsel, if the accused initiates further conversation, *is reminded of his*

*rights*, and knowingly and voluntarily waives those rights, any incriminating statements made during this conversation may be properly admitted." *Id.* at 214 (emphasis added) (citing *Bradshaw*, 462 U.S. at 1045-46, 103 S. Ct. 2830). Thus this Court held that Welch's statements were admissible.

....

... *Welch* and *Bradshaw* involve instances where the accused invoked the right to silence or counsel, the interrogation ceased, and the accused allegedly reinitiated communication with officers. However, if an accused invokes his or her *Miranda* rights but later reinitiates communication, *an accused must be reminded of his or her Miranda rights* pursuant to this Court's holding in *Welch*.

*Shelly*, 262 So. 3d at 11-13 (other internal citations and footnotes omitted).

Importantly, the *Shelly* court later re-phrased its holding using slightly different language: "*Welch* ... specifically includ[es] a requirement that the accused be **specifically given** his or her *Miranda* rights *after an alleged reinitiation*." *Id.* at 13 (bold and underlining added).

Given the *Shelly* court's later re-phrased holding that the accused be "specifically given" his or her *Miranda* rights after an alleged reinitiation, we have interpreted that re-phrased holding as follows: "In other words, police must again **re-read** the *Miranda* rights before commencing further conversation." *Quarles v. State*, 290 So. 3d 505, 507 (Fla. 4th DCA 2020) (emphasis added).

### b. *Applying the Foregoing Standards to The Instant Case*

1. The entire December 17, 2015, conversation was admissible.

The defendant spontaneously asked the deputy why he (the defendant) was in the hospital. The deputy replied, "You don't know why you are here?" The defendant did not verbally respond. He shook his head, turned away, and closed his eyes. While the defendant could have answered the deputy's query with an incriminating response, we cannot conclude that the deputy's query was reasonably likely to have elicited an incriminating response. The defendant just as easily could have responded, "No, I don't," or "I don't remember," or some other non-incriminating response. *See Innis*, 446 U.S. at 301-02 ("[S]ince the police surely cannot be held accountable for the unforeseeable results of their words or actions, the

definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response.").

About thirty minutes later, the defendant made the incriminating statement, "I stabbed a couple of people." Given the length of time from the previous exchange, we conclude the defendant's incriminating statement was spontaneous, and was not reasonably likely to have been elicited by the deputy's earlier query. Even if we concluded the deputy's earlier query had elicited the defendant's incriminating statement, the test is whether the deputy's query was reasonably likely to have elicited an incriminating response. As stated in our prior paragraph, we conclude the deputy's earlier query was not reasonably likely to have elicited an incriminating response, regardless of the fact that the defendant, thirty minutes later, made the incriminating statement.

After the defendant made the incriminating statement, "I stabbed a couple of people," the deputy replied, "You stabbed a couple of people?", to which the defendant responded, "Yeah a couple of f*** and a damn dog." We do not find the deputy's query, simply repeating the defendant's earlier incriminating statement in the form of a question, but without encouraging the defendant to elaborate on what he had just said, to have been interrogation. *See Gordon v. State*, 213 So. 3d 1050, 1053 (Fla. 4th DCA 2017) ("An officer's request for clarification of a spontaneous statement generally does not constitute interrogation.") (quoting *United States v. Chipps*, 410 F.3d 438, 445 (8th Cir. 2005)).

Based on the foregoing, we conclude the entire December 17, 2015, conversation was admissible. Thus, the trial court correctly refused to suppress any portion of that conversation.

2. The entire December 19, 2015, conversation was admissible.

The defendant spontaneously said he was in a bad mood. When the deputy asked the defendant why he was in a bad mood, the defendant responded, "Dude, I'm f*****. I feel like I just f***** my life up." The deputy asked the defendant, "Why do you think you f***** your life up?" The defendant responded, "Dude, I'm just f*****. I know what I did. I'm going to prison for my whole f****** life." The defendant then recited Bible scriptures and stated that his life in prison would be horrible. The defendant further stated several times he was upset about having to go to jail for life at such a young age. The defendant also admitted to having used marijuana, cocaine, and ecstasy, and stated, "Dude, I've tried it all."

18

We do not consider the deputy's query asking why the defendant was in a bad mood to have been interrogation. Instead, we find the deputy's query to have been another request for clarification. Our finding is primarily based on the fact that the deputy was guarding the defendant at the hospital, and thus was responsible for not only the public's safety, but also the defendant's well-being at the hospital. *Gordon*, 213 So. 3d at 1053. The defendant just as easily could have responded, "I don't feel well," or "I'm being mistreated," or some other non-incriminating response. The fact that the defendant instead made the incriminating response, "Dude, I'm f*****. I feel like I just f***** my life up," did not convert the deputy's query into interrogation. *Innis*, 446 U.S. at 301-02.

The deputy's follow-up query, "Why do you think you f***** your life up?," obviously comes closer to possibly constituting interrogation, because the deputy knew that the defendant was accused of having committed two murders and other crimes. However, again, we recognize that the defendant could have been referring to some other significant life event unrelated to the crimes. Thus, we conclude the deputy's follow-up query was not reasonably likely to elicit an incriminating response. The fact that the defendant then made several incriminating responses does not change our conclusion. *Innis*, 446 U.S. at 301-02.

Based on the foregoing, we conclude the entire December 19, 2015, conversation was admissible. Thus, the trial court correctly refused to suppress any portion of that conversation.

### 3. Most of the December 20, 2015, conversation was inadmissible.

The defendant and the deputy were engaged in a conversation about miscellaneous topics when the defendant asked, "What do you think I will get?" The deputy asked the defendant what he meant. The defendant responded, "[W]hat do you think I will get for killing those two f***?" The deputy asked the defendant, "What do you mean, what do you think you're being punished for?" The defendant responded that the story was more complicated than the deputy thought. The defendant proceeded to let the deputy know the entire story of what happened, up to and including his apprehension, thereby confessing to all of the crimes in great detail.

We conclude the defendant's question, "What do you think I will get?" was spontaneous and therefore admissible. The deputy's follow-up query, asking what the defendant meant, again comes closer to possibly constituting interrogation, because the deputy knew that the defendant was accused of having committed two murders and other crimes. However, because the defendant at that point was not specifically referring

to the crimes, we conclude the deputy's follow-up query was not reasonably likely to elicit an incriminating response. Thus, the defendant's incriminating response, "[W]hat do you think I will get for killing those two f***?," was admissible. *Innis*, 446 U.S. at 301-02.

However, the remainder of the conversation, starting with the deputy asking the defendant, "What do you mean, what do you think you're being punished for?," through the defendant's recitation of the crimes, and up to and including his apprehension, was inadmissible. Once the defendant asked the deputy, "[W]hat do you think I will get for killing those two f***?," the deputy should have known that any words or actions on his part, which corresponded to the defendant's question about the punishment for his crimes, were reasonably likely to have elicited an incriminating response from the defendant. *Innis*, 446 U.S. at 301-02. Thus, pursuant to *Shelly*, before the deputy propounded his next query, "What do you mean, what do you think you're being punished for?," the deputy was required to have specifically given the defendant his *Miranda* rights again, in order for the defendant's responses to have been considered as a knowing and voluntary waiver of those rights. *Shelly*, 262 So. 3d at 13.

We do not consider the deputy's prefatory comments to the defendant's lengthy confession to have satisfied *Shelly*'s "requirement that the accused be **specifically given** his or her *Miranda* rights after an alleged reinitiation." 262 So. 3d at 13 (emphasis added). As stated above, the deputy's prefatory comments consisted of the following:

- "Hey, I'm a law enforcement officer and you can say anything you want to me, but I'm going to write it down (on my laptop)."
- "I don't want you to tell me anything unless you want to talk to me."
- "Well you know, I'm in uniform. I'm here. And if you want to have a conversation, we could talk. But … as far as specific crimes … I'm not going to ask you specific questions about specific crimes."

At best, the deputy's second comment was a veiled reminder of the defendant's right to remain silent. However, none of the deputy's comments reasonably can be interpreted as having specifically reminded the defendant of his right to counsel, the very right which he exercised – twice – when he was read his *Miranda* rights on November 21, 2015. Moreover, after the defendant was read his *Miranda* rights, twenty-nine days passed, during which the defendant was being treated for his gunshot wounds, until this December 20, 2015, conversation occurred.

We understand the argument that a reasonable person in the defendant's position may have been able to remember his *Miranda* rights

without having a police officer specifically give the *Miranda* rights again. However, we are bound to follow our supreme court's requirement in *Shelly* that "the accused be **specifically given** his or her *Miranda* rights after an alleged reinitiation." 262 So. 3d at 13 (emphasis added).

4. <u>Nearly all of the December 25, 2015, conversation was inadmissible.</u>

The defendant's initial questions to the deputy about prison and how much time he could get for the crimes which he committed were admissible as spontaneous statements.

However, the remainder of the conversation – all prompted by the deputy's series of questions which were reasonably likely to elicit incriminating responses, and without having specifically given the defendant his *Miranda* rights again – was inadmissible. The deputy asked the defendant:

- what crime did he think he would get the most time for;
- what his second worst crime was;
- if God's voice guided him in every crime which he committed; and
- if the defendant considered turning himself into the police or just stopping and calling for help.

We understand that after the deputy's questions, some of the defendant's incriminating statements were not directly responsive to the questions, but instead addressed other aspects of the crimes. For example, after the deputy asked the defendant what his second worst crime was, the defendant immediately responded running from the police and stabbing the K9. However, the defendant then asked the deputy if drinking the victims' blood was a serious crime, and also asked about the elderly woman from whom he took the shirt and purse. Although the latter incriminating statements were not directly responsive to the deputy's question, we conclude the latter incriminating statements logically were prompted by the deputy's continuation of the conversation about the crimes generally. The record does not indicate any temporal break by which we could consider the latter incriminating statements to have been made spontaneously. *See Innis*, 446 U.S. at 301 ("[T]he term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.") (footnote omitted).

5. Nearly all of the January 7, 2016, conversation was inadmissible.

The defendant's initial question to the deputy, asking whether the deputy thought the defendant was going to prison, was admissible as a spontaneous statement.

However, the remainder of the conversation – all prompted by the deputy's series of questions which were reasonably likely to elicit incriminating responses, and without having specifically given the defendant his *Miranda* rights again – was inadmissible. The deputy asked the defendant:

- what he thought his sentence might be for his crimes;
- what the defendant's interpretation of being reborn was;
- if the defendant saw himself as a bad person; and
- if the defendant knew the law regarding taking a life.

Again, although certain incriminating statements which the defendant made during this conversation were not directly responsive to the deputy's questions, we conclude all of the defendant's subsequent statements logically were prompted by the deputy's continuation of the conversation about the crimes generally, as the record does not indicate any temporal break by which we could consider the subsequent incriminating statements to have been made spontaneously. *Innis*, 446 U.S. at 301.

### c. *Harmless Error Analysis*

"*Miranda* violations are subject to a harmless error analysis." *Shelly*, 262 So. 3d at 17 (citation omitted). "To affirm a conviction despite error at trial, the [s]tate must prove beyond a reasonable doubt that the error 'did not contribute to the verdict or, alternatively stated, that there is no reasonable possibility that the error contributed to the conviction.'" *Id.* at 17-18 (quoting *State v. DiGuilio*, 491 So. 2d 1129, 1135 (Fla. 1986)). Under *DiGuilio*, an appellate court's focus is on the error's overall effect "on the trier of fact; not to substitute itself for the trier of fact and reweigh the evidence." *Shelly*, 262 So. 3d at 18 (citing *DiGuilio*, 491 So. 2d at 1139). Further, as explained in *DiGuilio*:

> [H]armless error analysis must not become a device whereby the appellate court substitutes itself for the jury, examines the permissible evidence, excludes the impermissible evidence, and determines that the evidence of

22

guilt is sufficient or even overwhelming based on the permissible evidence ....

*Overwhelming evidence of guilt does not negate the fact that an error that constituted a substantial part of the prosecution's case may have played a substantial part in the jury's deliberation and thus contributed to the actual verdict reached,* for the jury may have reached its verdict because of the error without considering other reasons untainted by error that would have supported the same result.

....

... The test is not a sufficiency-of-the-evidence, a correct result, a not clearly wrong, a substantial evidence, a more probable than not, a clear and convincing, or even an overwhelming evidence test. Harmless error is not a device for the appellate court to substitute itself for the trier-of-fact by simply weighing the evidence. The focus is on the effect of the error on the trier-of-fact. *The question is whether there is a reasonable possibility that the error affected the verdict.* The burden to show the error was harmless must remain on the state. *If the appellate court cannot say beyond a reasonable doubt that the error did not affect the verdict, then the error is by definition harmful.*

491 So. 2d at 1136-39 (citation and internal indentations omitted; emphasis added).

Applying *DiGuilio* here, the trial court's errors in denying certain portions of the defendant's motion to suppress, in the manner which we have addressed above, were not harmless. We acknowledge that, even without the improperly admitted statements, the evidence proving the defendant committed the murders and other crimes was overwhelming. However, the *DiGuilio* test is not an "overwhelming evidence test." *Id.* at 1139. The state has not proven "beyond a reasonable doubt that the error[s] complained of did not contribute to the verdict or, alternatively stated, that there is no reasonable possibility that the error[s] contributed to the conviction." *Id.* at 1135.

As the defendant has argued, "It is no exaggeration to say that [the deputy's] testimony [reciting the defendant's incriminating statements] was the centerpiece of the State's case." As the state highlighted during its closing arguments, those elicited incriminating responses proved

and/or corroborated each of the crimes, and further undermined the defendant's insanity defense.

We emphasize the latter effect, that is, undermining the defendant's insanity defense, in greater detail. Pursuant to Florida Standard Jury Instruction (Crim.) 3.6(a), the trial court instructed the jury, in pertinent part:

> An issue in this case is whether [the defendant] was insane when the crime allegedly was committed.
>
> A person is considered to be insane when:
>
> 1. [He] … had a mental infirmity, disease, or defect.
>
> 2. Because of this condition
>
>     a. [he] … did not know what [he] … was doing or its consequences or
>
>     b. although [he] … knew what [he] … was doing and its consequences, [he] … did not know it was wrong.
>
> All persons are presumed to be sane. The defendant has the burden of proving the defense of insanity by clear and convincing evidence. …
>
> In determining the issue of insanity, you may consider the testimony of expert and nonexpert witnesses. The question you must answer is not whether the defendant is insane today, or has ever been insane, but whether instead the defendant was insane at the time the crime allegedly was committed.
>
> ….
>
> Although insanity is a defense, mental or psychiatric conditions not constituting insanity are not defenses to any crime in this case. Unless there is clear and convincing evidence that [the defendant] was insane at the time of the crime(s) alleged, any evidence of mental illness, an abnormal mental condition, or diminished mental capacity may not be taken into consideration to show that [he] … lacked the specific intent or did not have the state of mind essential to

24

proving that [he] … committed the crime[s] charged [or any lesser crime].

> ….

Fla. Stand. Jury Instr. (Crim.) 3.6(a).

Here, defense counsel presented one of the arresting officers, several of the defendant's family members, the defendant's most recent employer, and two expert witnesses, all in an effort to prove, by clear and convincing evidence, the defendant had a mental infirmity, disease, or defect, and because of this condition, he did not know what he was doing or its consequences or did not know it was wrong.

However, the state, through the deputy's testimony, presented the several inadmissible incriminating statements addressed above, which served as the state's strongest evidence to show that the defendant *knew* what he was doing and its consequences, and by his reasons for flight, *knew* it was wrong (i.e., consciousness of guilt). Thus, the trial court's error in admitting these several inadmissible incriminating statements was not harmless.

### *Conclusion*

In sum, after the defendant reinitiated conversation, because the deputy failed to specifically give the defendant his *Miranda* rights again before asking him questions which were reasonably likely to elicit, and did elicit, incriminating responses, which the state presented at trial in their entirety and were not harmless, we are compelled to reverse the defendant's convictions and remand for a new trial on all charges. On remand, the trial court shall exclude those incriminating statements which we have described above as having been obtained in violation of the defendant's *Miranda* rights. The trial court may admit the other incriminating statements which we have described above as having been spontaneously made and therefore not obtained in violation of the defendant's *Miranda* rights.

Our reversal and remand for a new trial moots two other arguments which the defendant raised on appeal, claiming the trial court erred in denying his post-trial request to interview a juror, and in overruling his discovery objection to a state witness's late-disclosed PowerPoint presentation. The three remaining arguments which the defendant raised on appeal – claiming the trial court erred in overruling a "facts not in evidence" objection during the psychologist's testimony, in overruling a

hearsay objection during the psychiatrist's testimony, and in denying defense counsel's request to add language to the insanity defense's standard jury instruction – all lack merit, without further discussion.

*Reversed and remanded for new trial.*

WARNER, J., concurs.
ARTAU, J., concurs in part and dissents in part with an opinion.

ARTAU, J., concurring in part and dissenting in part.

While I concur in part with the majority because this court's decision in *Quarles v. State*, 290 So. 3d 505 (Fla 4th DCA 2020), requires us to conclude that the trial court erred in denying suppression of the statements determined by the majority to be inadmissible, I dissent from the majority's reversal of the defendant's convictions because the defendant's inadmissible statements were merely cumulative to the other properly admitted evidence at trial, making the trial court's error harmless.

*Quarles* held that law enforcement must "re-read the *Miranda* rights before commencing further conversation" with a suspect after he or she has reinitiated communication with law enforcement following an initial *Miranda* rights invocation. *Id.* at 507. However, I do not believe the *Quarles* holding was required by our supreme court's decision in *Shelly v. State*, 262 So. 3d 1 (Fla. 2018). Instead, I agree with Justice Lawson that what the *Shelly* majority articulated as having been adopted in *Welch v. State*, 992 So. 2d 206 (Fla. 2008), was "dicta" because "the supposed *Welch* requirement that police remind the suspect of *Miranda* rights" was "never raised [by the defendant in *Shelly*] as an issue for review because it was not implicated by the facts of the case (as the police *did* restate the *Miranda* warnings)." *See Shelly*, 262 So. 3d at 24 (Lawson, J., dissenting) (explaining how *Welch* applied but did not expand upon the "totality of the circumstances" test set forth in *Oregon v. Bradshaw*, 462 U.S. 1039, 1044-45 (1983), and therefore *Shelly* could not have adopted a new standard "under the guise of a jurisdictional analysis").

Thus, while I agree that the panel in this case is bound by *Quarles*, I would certify the following question to the supreme court as being one of great public importance:

> DID *SHELLY V. STATE*, 262 SO. 3D 1 (FLA. 2018), ABANDON THE "TOTALITY OF THE CIRCUMSTANCES" TEST SET FORTH IN *OREGON V. BRADSHAW*, 462 U.S. 1039 (1983), IN FAVOR OF THE REQUIREMENT RECOGNIZED IN *QUARLES*

*V. STATE*, 290 SO. 3D 505 (FLA. 4TH DCA 2020), THAT LAW ENFORCEMENT MUST RE-READ *MIRANDA* RIGHTS BEFORE COMMENCING FURTHER INTERROGATION WITH A SUSPECT WHO HAS RE-INITIATED COMMUNICATION SUBSEQUENT TO INVOCATION OF HIS OR HER *MIRANDA* RIGHTS?

Moreover, I dissent because in my view the defendant's convictions should be affirmed based on application of the well-established harmless error test set forth in *State v. DiGuilio*, 491 So. 2d 1129, 1138 (Fla. 1986), which "requires a close examination of the permissible evidence on which the trier of fact could have legitimately relied, as well as an even closer examination of the impermissible evidence which might have possibly influenced the verdict." *Erickson v. State*, 565 So. 2d 328, 334 (Fla. 4th DCA 1990) (citing *DiGuilio*, 491 So. 2d at 1138).

In considering whether error is harmful, "[i]t is well settled that even incorrectly admitted evidence is deemed harmless and may not be grounds for reversal when it is essentially the same as or merely corroborative of other properly considered testimony at trial." *Id.*; *see also Hojan v. State*, 3 So. 3d 1204, 1210 (Fla. 2009) ("[W]here the evidence introduced in error was not the only evidence on the issue to which the improper evidence related, the introduction can be harmless."); *cf. Anderson v. State*, 230 So. 3d 175, 177 (Fla. 4th DCA 2017) (erroneous admission of hearsay testimony could not be considered harmless because it "was the *only evidence*" tying the victim's description of the perpetrator's gun to the defendant's gun).

As acknowledged by the majority in its harmless error analysis, "even without the improperly admitted statements, the evidence proving the defendant committed the murders and other crimes was overwhelming." Thus, the defendant's inadmissible statements served only to further corroborate the other overwhelming evidence that he had committed the charged crimes. Nonetheless, the majority concludes that "several inadmissible incriminating statements" were not harmless because they "show that the defendant *knew* what he was doing and its consequences, and by his reasons for flight, *knew* it was wrong (i.e., consciousness of guilt)." Therefore, the majority concludes that the trial court's failure to suppress the inadmissible statements cannot be considered harmless as they negated the defendant's claim that he was insane at the time of the offenses by demonstrating his appreciation of the wrongfulness and criminality of his actions.

However, the majority also concludes, and I agree, that the statements made by the defendant on December 19, 2015 were admissible, including his statements lamenting having to go to jail for life at such a young age: "Dude, I'm f*****. I feel like I just f***** my life up. Dude, I'm just f*****. *I know what I did.* I'm going to prison for my whole f****** life." (emphasis added). By the time the inadmissible statements were erroneously presented, the jury had already heard the defendant's properly admitted December 19, 2015 statements which negated his claim that he was insane at the time of the offenses by demonstrating his appreciation of the wrongfulness and criminality of his actions.

Accordingly, the trial court's error in not suppressing the defendant's subsequent inadmissible statements was harmless because they were merely cumulative to the properly admitted evidence, including the defendant's statements made on December 19, 2015, establishing the specifics of the crimes and negating the defendant's insanity defense. *See, e.g., Blanton v. State*, 978 So. 2d 149, 157 (Fla. 2008) (erroneous admission of evidence that was "merely cumulative" to "properly admitted evidence" was harmless under *DiGuilio* standard); *Casica v. State*, 24 So. 3d 1236, 1241 (Fla. 4th DCA 2009) (erroneous admission of evidence "was harmless" where evidence "was cumulative" to other "properly admitted" evidence); *Liscinsky v. State*, 700 So. 2d 171, 172 (Fla. 4th DCA 1997) (admission of challenged testimony, if erroneous, was harmless where "testimony was merely cumulative of several other witnesses' testimony at trial").

I therefore respectfully dissent from the majority's conclusion that the defendant is entitled to a new trial based on the trial court's error in denying suppression of the cumulative inadmissible statements.

\* \* \*

***Not final until disposition of timely filed motion for rehearing.***